Lillian S. Horton *v.* J. Leonard Vickers [Harry Watstein, Administrator, Substituted Defendant]

The Putnam Trust Company et al., Executors and Trustees (Estate of Edmund P. Horton) *v.* J. Leonard Vickers [Harry Watstein, Administrator, Substituted Defendant]

Baldwin, O'Sullivan, Wynne, Daly and Ryan, Js.

Argued November 3, 1954—decided February 1, 1955

*Eugene L. Bondy,* of the New York bar, and *Harry P. Lander,* with whom, on the brief, was *Arthur H. Ratner,* for the appellants (plaintiffs).

*Cyril Coleman,* for the appellee (defendant).

DALY, J. These two cases were tried together. In one the plaintiff, Lillian S. Horton, claimed damages for injuries alleged to have been caused by the malpractice of Dr. J. Leonard Vickers. In the other, brought by her husband, Edmund P. Horton, against the same defendant, damages were claimed for the loss of her society and services and for expenses incurred and to be incurred in an effort to cure her injuries. His right of recovery, if any, was limited to reimbursement for expenses incurred by him by reason of his wife's injury. *Beckert* v. *Doble,* 105 Conn. 88, 91, 134 A. 154; *Marri* v. *Stamford Street R. Co.,* 84 Conn. 9, 23, 78 A. 582. He has died since the institution of these actions and the executors and trustees under his will have intervened and have become the parties plaintiff in the action brought by him. Dr. Vickers died after the cases were tried and judgments had been rendered for him. Harry Watstein, administrator of his estate, was cited in to defend the plaintiffs' appeals. Dr. Vickers, however, is referred to as the defendant.

The plaintiff Lillian S. Horton, in her assignment of errors, has made a wholesale attack upon the finding. She claims that the court erred in refusing to find material facts as set forth in sixty-six paragraphs of her draft finding, in finding without evidence certain facts as set forth in sixteen paragraphs of the finding, and in reaching the conclusions stated in it. In the companion case a similar attack is made. This method has been frequently criticized by this court as an attempt to substitute the draft finding for the major part of the finding. It does not commend itself. *Eastern Sportswear Co.* v. *S. Augstein & Co.,* 141 Conn. 420, 422, 106 A.2d

476; *K. B. Noble Co.* v. *Popielarczyk,* 125 Conn. 699, 701, 8 A.2d 33. Of the many questions raised in the assignment of errors, only those which have been argued orally and pursued in the plaintiffs' brief will be considered. All others are treated as abandoned. *Marchlewski* v. *Casella,* 141 Conn. 377, 378, 106 A.2d 466; *Freund* v. *Burns,* 131 Conn. 380, 386, 40 A.2d 754; Maltbie, Conn. App. Proc., § 165. The first of the claims pursued, that the trial court erred as a matter of law in finding decisive facts wholly without support in the evidence, is without merit, since the facts found were amply supported by the evidence.

The facts may be summarized as follows: On June 11, 1946, Lillian S. Horton, hereinafter called the plaintiff, was eighty years of age and lived with her husband in Greenwich. She was an active, healthy woman living a happy and useful life, caring for her home and enjoying an active social life. On that day she fell in her home and sustained a fracture of the left hip, specifically an intracapsular fracture of the left femur.

A local osteopathic physician, Dr. Van Duzer, who was called in the next day, recognized the existence of the fracture and referred the patient to the defendant, who was a general surgeon. Most of his work was, however, in the field of bone and joint surgery. At that time he was a physician practicing in the town of Greenwich, and he held himself out to the public and to the plaintiff as a specialist in orthopedic surgery. He received his degree in medicine from Johns Hopkins University in 1924 and had been an instructor in medicine there and later at Yale Medical School. After serving internships in Detroit and Cooperstown, New York, he studied surgery in Vienna. He then became a junior assist-

ant on the staff of Bellevue Hospital and an instructor in surgery at the College of Physicians and Surgeons in New York City. He entered private practice in Greenwich in 1931 and was a member of several medical societies.

The defendant arranged for the plaintiff to be taken to the Greenwich Hospital that day. X-rays taken at the hospital upon her admission confirmed the fact that there was an intracapsular fracture of the neck of the left femur, with slight impaction and angulation present. The fracture was at a site where circulation is likely to be poor and consequently the chances of union are not as good as in fractures of other parts of the hip. The Greenwich Hospital is a modern approved hospital, with the equipment and facilities generally possessed by first-grade hospitals in New York City and other places where the highest standards prevail. After consultation with Dr. McCreery, then chief of staff of the Greenwich Hospital and associate professor of clinical surgery at the College of Physicians and Surgeons in New York, the defendant decided to transfix the fragments of the fractured bone with a Smith Peterson nail in order to immobilize the parts and promote union. This was the treatment of choice because in a slightly impacted fracture the fragments may fall apart and never knit if they are not nailed together. With the fragments nailed together, the patient can be gotten out of bed earlier.

Immobilization of fragments of a fractured hip bone may be achieved by application of a cast, by traction, by the insertion of a Smith Peterson nail, or by other means. On June 14, while the patient was under a general anesthetic, the defendant made an incision and inserted a Smith Peterson nail. As an x-ray examination, made immediately in the

operating room, showed the position of the nail to be too high to be effective, it was withdrawn by the defendant. He immediately inserted the nail a second time. Another x-ray examination in the operating room revealed that the nail was then in proper alignment to transfix the fragments and that the head of the nail protruded about one-half an inch from the cortex. He was satisfied with the alignment and direction of the nail and drove it in further until he found, by digital examination, that the head was nearly flush with the cortex, firmly transfixing both fragments. The wound was then closed in the usual fashion. The plaintiff reacted well to the operation at first. However, she began to show signs of retaining urine and on June 18 it was necessary for her to be catheterized. On June 20 and for five days thereafter the defendant caused her to be placed in a chair for a period each day to promote drainage and relieve the bladder condition.

This condition, however, did not improve, although urinalyses made at the hospital at the defendant's direction disclosed no infection in the bladder until June 23. When a test on that day indicated such an infection, the defendant called in Dr. Washburn, a competent specialist in urology, who examined the plaintiff on June 25 and took over the treatment of the bladder condition. This condition was serious, for if the infection was not arrested it would pass through the ureter into the kidneys and there could produce a fatal urinary sepsis. The plaintiff's condition became so grave that at one time she was on the point of death. Dr. Washburn instituted a treatment known as tidal drainage, which is an automatic irrigating system of the bladder. The plaintiff remained in bed three days before proper drainage was established.

Thereafter, both the defendant and Dr. Washburn concurred in once more getting the plaintiff out of bed and into a chair daily, except for one day, to promote drainage. On July 13 she was allowed to use a walker, a device similar to that used by infants who are learning to walk. By its use, the bulk of the weight of the body is transferred from the patient's legs to the frame of the walker. Both doctors concurred in the use of the walker because it tended to promote better drainage than could be obtained from having the plaintiff sit in a chair. They were aware that their decision involved a calculated risk. On the one hand, getting her into the walker involved the risk that the fracture site might never unite. On the other hand, if the stubborn and difficult infection continued, her life was in danger. When the plaintiff was placed in a walker both the defendant and Dr. Washburn believed that the position of the bones at the fracture site was unsatisfactory. The plaintiff, however, was in no condition to undergo a second operation for renailing the bones, so the doctors agreed to give, and did give, priority to the treatment of the bladder infection until the time of her discharge from the hospital. With this treatment, her temperature, which had been elevated, gradually subsided to almost normal on the day of her discharge, August 8, 1946, and while she was then able to pass her urine normally there was still some frequency and some residual infection.

On the day before the plaintiff's discharge from the Greenwich Hospital, x-rays taken at the direction of the defendant disclosed, as he had previously suspected, that the fracture site was not united, that there had been absorption of the head and neck of the femur due to inadequate circulation and that the nail was no longer effective. At the urging of

members of her family, the defendant permitted the plaintiff to be discharged from the hospital and noted in the hospital record over his signature that she left there with her fractured hip "unimproved." She was discharged by him in the care of Dr. Washburn and Dr. Van Duzer with the expectation that, when her urinary incontinence and residual infection had cleared up, the defendant would operate to remove the pin. Dr. Washburn and Dr. Van Duzer attended the plaintiff after her discharge until about October 1, 1946, when other doctors were called in by her or members of her family. When her urinary difficulties had cleared up, about the middle of October, the nail was removed by other doctors at the New Rochelle Hospital in New Rochelle, New York.

The plaintiff is permanently crippled and will never be able to walk on her left leg again. She has suffered and will continue to suffer extreme pain because of the nonunion, rotation and overriding of the fragments of the fractured left hip. The injury to her hip can never be repaired. Substantial sums have been expended for the medical, hospital and nursing services furnished to her while she was a patient at the New Rochelle Hospital, where an unsuccessful attempt was made to correct the condition of her injured hip, and for additional nursing care for her up to the time of trial. Because of her deformity and incapacity, she requires the continuous services of a practical nurse. Between June 11, 1946, and the time of her husband's death, she was incapable of providing him with the full benefits of her comfort, society and services.

Dr. Charles W. Banks was the only expert witness for the plaintiffs. They claim that the trial court disregarded his testimony and, therefore, erred in concluding that they had not sustained the burden of

proving malpractice. They contend, as alleged in the amendment to their assignment of errors, that this is shown by the memorandum of decision. Accordingly, we have consulted the memorandum, as we have the right to do in order to obtain a better understanding of the basis of the trial court's decision. *Duggan* v. *Byrolly Transportation Co.*, 121 Conn. 372, 375, 185 A. 85; Maltbie, Conn. App. Proc., p. 120. A perusal of the memorandum indicates that the trial court examined the testimony of Dr. Banks with great care. In the memorandum, the court pointed out that on no occasion during the trial did Dr. Banks testify that the defendant had not exercised, in his care and treatment of the plaintiff, that degree of care, skill and diligence ordinarily had and exercised by surgeons in the same general neighborhood and in the same line of practice. It was also noted that although the witness testified that he considered certain procedures followed by the defendant as having been "bad practice," it was impossible to determine from his use of that phrase whether he meant "bad practice" as measured by his "subjective standards or by Bellevue Hospital standards, or by indefinite and unfixed standards of orthopedic surgery." The discussion, in the memorandum of decision, of the testimony of this witness does not compel the deduction that credence was given to all or any part of it. The trial court, having heard and seen the defendant and his witnesses, could accept their testimony and reach the conclusions stated in the finding, regardless of what Dr. Banks testified to. It is one of the important functions of a trier to determine the relative credit to be given to oral evidence. *Eastern Sportswear Co.* v. *S. Augstein & Co.*, 141 Conn. 420, 422, 106 A.2d 476. In addition, even if any conclusions stated in the memorandum of decision had

been at variance with those stated in the finding, the latter would prevail. *Stults* v. *Palmer,* 141 Conn. 709, 710, 109 A.2d 592. The trial court applied the correct rule in evaluating Dr. Banks' criticism of the professional conduct of the defendant. "The test in this State, in determining what constitutes reasonable care, skill and diligence, is that which physicians and surgeons in the same general neighborhood and in the same general line of practice ordinarily have and exercise in like cases." *Geraty* v. *Kaufman,* 115 Conn. 563, 573, 162 A. 33; *Marchlewski* v. *Casella,* 141 Conn. 377, 380, 106 A.2d 466; *Force* v. *Gregory,* 63 Conn. 167, 169, 27 A. 1116.

The trial court did not err in concluding that the conduct of Dr. Vickers conformed to our standards and that the plaintiffs failed to sustain the burden of proof.

There is no error.

In this opinion the other judges concurred.