553 F.2d 123
 179 U.S.App.D.C. 389
 Jay ROBBINS, M.D., Individually and as Administrator of the
Estate of James Alan Robbins, Deceased, and as Legal
Representative of James Alan Robbins, Deceased, and Joan
Robbins, Individually and as Legal Representative of James
Alan Robbins, Deceased, Appellants,
v.
Marvin FOOTER, M.D., et al.
 No. 75-1988.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 10, 1976.
Decided Jan. 21, 1977.
Rehearing Denied March 4, 1977.
 
 Robert J. Stanford, Washington, D.C., for appellants.
 Thomas J. Scanlon, Cleveland, Ohio, for appellees.
 Before TAMM, MacKINNON and WILKEY, Circuit Judges.
 Opinion for the Court filed by TAMM, Circuit Judge.
 TAMM, Circuit Judge:
 
 
 1
 This is an appeal from a district court judgment in favor of the defendant-appellee Doctor Marvin P. Footer denying the malpractice claim of plaintiffs-appellants Jay H. and Joan Robbins. The Robbins allege error by the trial court in the disqualification of Dr. S. Edward Davis as an expert witness on the issue of whether Dr. Footer, as a specialist certified by the American Board of Obstetrics and Gynecology, breached the standard of care required in the delivery of the Robbins' child, James Alan Robbins, who died shortly after his birth. They argue that the court erroneously required Dr. Davis to establish his familiarity with the local medical practice in the District of Columbia. We hold that both the trial court's disqualification of Dr. Davis and its instructions to the jury were inappropriately based on the "same or similar locality" rule which should not be applied to physicians who hold themselves out as nationally certified specialists. We vacate the judgment of the district court and remand the case for a new trial based upon a national standard of care.
 
 I. FACTUAL BACKGROUND
 
 2
 James Alan Robbins was born in a depressed respiratory condition requiring emergency resuscitation. His condition continued to worsen and he died within eight hours of his birth. The child's parents brought suit in the United States District Court for the District of Columbia against Dr. Footer, the attending physician, and George Washington University Hospital. The Robbins alleged that the intense and frequent uterine contractions which occurred after Dr. Footer administered the drug "pitocin" to stimulate Mrs. Robbins' labor process sharply limited their child's supply of oxygen, jeopardizing his life and rendering him highly susceptible to injury from the subsequent forceps delivery. The district court granted George Washington Hospital a directed verdict which the appellants do not challenge. The Robbins' claim against Dr. Footer, however, was submitted to the jury on the basis of the testimony of Dr. Karlis Adamsons that Dr. Footer had not complied with the national standard of care for specialists in obstetrics which was recognized in the District of Columbia as it was throughout the United States.
 
 
 3
 The testimony of Dr. S. Edward Davis, a second expert witness, was rejected by the district judge because Dr. Davis could not say that he was familiar with the standard of care in the District of Columbia. Out of the presence of the jury, Dr. Davis testified that the standard of care for obstetricians was based on a uniform national examination and on information available in scientific journals with national circulation. J.A. at 7-8. He also stated, however, that the actual common practice in Washington, D.C. was more lax than the national standard applied at the Medical College of Virginia in Richmond where he had been practicing before moving to the National Institutes of Health, J.A. at 20-22, and that he was not aware of a standard of care for obstetricians in the District of Columbia that differed from the national standard. The trial judge ruled that Dr. Davis was not qualified to testify as to the standard of care required of the defendant under the rule, applicable in the District of Columbia, that a physician must exercise the care ordinarily exercised by the members of his profession in his own or similar locality.[1] J.A. at 14, 38-40.
 
 
 4
 The case was submitted to the jury under instructions which also followed the same or similar locality standard of care rule. The jury returned a verdict for the defendant and judgment was entered on that verdict. The Robbins' then filed this appeal arguing that the exclusion of Dr. Davis as an expert witness was error.
 
 II. STANDARD OF CARE
 
 5
 The conduct of a defendant in a negligence suit is usually measured against the conduct of a hypothetical reasonably prudent person acting under the same or similar circumstances. W. Prosser, The Law of Torts § 32, at 150 (1971). In medical malpractice cases, however, courts have required that the specialized knowledge and skill of the defendant must be taken into account. Id. at 161. Although the law has thus imposed a higher standard of care on doctors, it has tempered the impact of that rule by permitting the profession, as a group, to set its own legal standards of reasonable conduct. Whether a defendant has or has not conformed his conduct to a customary practice is generally only evidence of whether he has acted as a reasonably prudent person. See Hellweg v. Chesapeake & Potomac Telephone Co.,71 App.D.C. 346, 110 F.2d 546, 548 (1940); McCoid, The Care Required of Medical Practitioners, 12 Vand.L.Rev. 549, 605-06 (1959). In a malpractice case, however, the question of whether the defendant acted in conformity with the common practice within his profession is the heart of the suit. McCoid, supra at 606. As part of his prima facie case a malpractice plaintiff must affirmatively prove the relevant recognized standard of medical care exercised by other physicians and that the defendant departed from that standard when treating the plaintiff. Price v. Neyland, 115 U.S.App.D.C. 355, 320 F.2d 674, 677 (1963). In almost all cases the plaintiff must present expert witnesses[2] since the technical complexity of the facts and issues usually prevents the jury itself from determining both the appropriate standard of care and whether the defendant's conduct conformed to that standard.[3] In such cases there can be no finding of negligence without expert testimony to support it. Brown v. Keaveny, 117 U.S.App.D.C. 117, 326 F.2d 660, 661 (1963); cf. Canterbury v. Spence, 150 U.S.App.D.C. 263, 464 F.2d 772, 791-92 & n. 119 (dictum), cert. denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972).
 
 
 6
 The Robbins' claim that Dr. Footer's administration of a labor stimulating drug under the monitoring procedures he followed constituted actionable negligence, raises questions of substantial technical complexity well beyond the competence of the ordinary untutored lay person. Thus expert guidance was required and the Robbins offered the testimony of Drs. Adamsons and Davis. Dr. Adamsons' testimony, that the applicable standard of care for board certified specialists in obstetrics, like Dr. Footer, was uniform throughout the country and that Dr. Footer's practice fell below this national standard, was admitted into evidence before the jury. The proffered testimony of Dr. Davis to the same effect was rejected by the trial court, however, because he stated that the common practice in the District did not meet the strictures of the national standard and that he was not familiar with a standard of care which differed from the national standard.
 
 
 7
 The critical issue presented by this appeal is whether the standard of care required of a physician who holds himself out as a specialist in obstetrics, certified by a national board of examiners, should be determined by the practice within his profession nationally or by the practice among a more geographically circumscribed subset of his colleagues. The district court's exclusion of Dr. Davis's testimony and its instructions to the jury as to the applicable standard of care were based on its conclusion that Dr. Footer was only required to exercise that degree of care and skill ordinarily exercised by obstetricians in his community or in a similar locality. Since Dr. Davis stated that the common practice in the District differed from the national standard which was followed in Richmond, Virginia, where he had practiced, the trial court ruled that he was not qualified to testify to the standard of care required of Dr. Footer in the District of Columbia.
 
 
 8
 Geographic limitations on the appropriate reference group for establishing the standard of care which the law of negligence requires of a doctor first appeared in American decisions of the nineteenth century.[4] As originally formulated, the rule was sometimes interpreted as only holding a physician to the standards of those physicians who actually practiced in his community.[5] Even some relatively recent decisions have apparently adhered to this strict formulation.[6] The policy behind the rule was to prevent the small town practitioner from being held to the standards of practice of the more sophisticated urban areas.[7] The courts generally assumed that the rural practitioner had less access to the latest medical information and facilities than urban doctors and did not have the benefit of the same breadth of experience.[8] It was also argued that since the cities offered a more lucrative practice, they attracted the most talented doctors[9] and any attempt to hold country doctors to urban standards would only drive rural doctors out of practice, leaving small communities without any doctors.[10]
 
 
 9
 Early in the history of the locality rule it became obvious that strict adherence to the same locality requirement could completely immunize doctors who were the only practitioners in a small community and small groups of local physicians whose common lax practice fell below that ordinarily practiced in rural areas generally.[11] The rule was thus broadened to "the same or similar localities" the standard applied by the district court in this case. This modification presented no conceptual problem but its practical application generated continual difficulties in deciding whether two localities were similar. Although for at least one court geographic proximity played an important role[12] the focus of decision quickly moved away from strictly geographic factors towards general socioeconomic variables.[13] The modern trend, and now the majority view, is to consider factors directly related to the practice of medicine.[14] Under this majority rule, the court considers whether the medical facilities of the locality on which a proffered expert witness will base his testimony are comparable to those available in the defendant's community.[15]
 
 
 10
 Even the most liberal application of the "similar locality" rule carries with it the unstated assumption that some characteristics of a geographically defined area justify a different and perhaps lower standard of care in the exercise of medical judgment than the standard followed in localities which do not share those characteristics. In nineteenth century America the validity of this assumption may have been obvious enough for courts to accept without empirical proof. Its continuing validity in our age of ubiquitous national communication networks both within and without the medical profession is extremely doubtful. Even as the courts applied the locality rule it did not go unrecognized that the increasing standardization of medical training significantly undermined the application of geographic limitations to the population from which a qualified expert witness could be drawn to testify as to the required standard of care. See Sinz v. Owens, 33 Cal.2d 749, 767, 205 P.2d 3, 13 (1949) (Carter, J., dissenting); Montgomery v. Stary, 84 So.2d 34, 39-40 (Fla.1955) (dicta).
 
 
 11
 Modern medical education and postgraduate training has been nationalized.[16] Scientific information flows freely among medical institutions throughout the country. Professional journals and numerous other networks of continuing education are all national in scope. See Shilkret v. Annapolis Emergency Hosp. Ass'n, 276 Md. 187, 199, 349 A.2d 245, 252 (1975); D. Louisell & H. Williams, The Parenchyma of Law 183-84 (1960). Several courts have followed the lead of the medical profession and have established a national standard of care for all physicians, completely abandoning any locality limitation. The highest court of Maryland has just recently taken that step and now requires a physician "to use that degree of care and skill which is expected of a reasonably competent practitioner in the same class to which he belongs, acting in the same or similar circumstances." Shilkret, supra, 276 Md. at 200-01, 349 A.2d at 253. At least three other jurisdictions have also abandoned the locality rule. See Blair v. Eblen, 461 S.W.2d 370, 372-73 (Ky.1970); Pederson v. Dumouchel, 72 Wash.2d 73, 431 P.2d 973, 978 (1967) (en banc);[17] Shier v. Freedman, 58 Wis.2d 269, 206 N.W.2d 166, 174 (1973).
 
 
 12
 Even in jurisdictions which have not adopted a national standard for all malpractice issues, if a physician holds himself out as a specialist, as Dr. Footer has done in this case, he is held to the general standard of care required of all physicians in the same specialty. See Kronke v. Danielson, 108 Ariz. 400, 499 P.2d 156, 159 (1972) (en banc); Christy v. Saliterman, 288 Minn. 144, 179 N.W.2d 288, 302 (1970). In order to become a certified specialist in obstetrics, a physician must meet nationally uniform educational and residency requirements. See Shilkret, supra, 276 Md. at 198, 349 A.2d at 251. The textbooks used are national textbooks and the required examination is a national exam graded by a body of examiners selected so as to eliminate any regional peculiarities. See J.A. at 7. After certification, specialists keep abreast of developments in their field through medical specialty journals available throughout the nation and medical specialty societies with national memberships. It seems clear that the medical profession itself has adopted a national standard for membership in one of its certified specialties.[18] If the law remains tied to a locality standard, it ignores the reality of modern medicine in favor of an outdated mythology. See Shilkret, supra, 276 Md. at 198, 349 A.2d at 251.
 
 
 13
 We therefore hold that at least with respect to nationally certified medical specialists like Dr. Footer the "same or similar locality" rule no longer applies. Specialists are required to exercise that degree of care and skill expected of a reasonably competent practitioner in his specialty acting in the same or similar circumstances.[19]
 
 
 14
 Under this national standard for specialists, it is of course improper to exclude the testimony of a witness who has established his familiarity with the national standards of the specialty. Similarly, a national standard does not permit instructions to the jury to indicate that the defendant's conduct be compared only to the practice within his own geographic community or that of a similar locality.[20] Since the district court in this case excluded the testimony of Dr. Davis and instructed the jury on the basis of the similar locality rule which we find inapplicable to specialists, the judgment for the defendant is vacated and the case is remanded for a new trial.
 
 
 15
 Vacated and remanded.
 
 
 
 [1]
 Both the parties and the district court relied on Price v. Neyland, 115 U.S.App.D.C. 355, 320 F.2d 674, 677 (1963) as authority for application of the "same or similar locality" rule to a malpractice claim based on actions within the District of Columbia. The holding of Price is not directly applicable, however, since the locus of the tort in that case was Arlington, Virginia and the court stated its standard of care holding as a matter of Virginia law. Id. 115 U.S.App.D.C. 355, 320 F.2d at 677 & n. 3. Nevertheless the court did comment that the law of Virginia was the same "as elsewhere" and did not note any different standard applicable to the District of Columbia. Id
 Prior to passage of the District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L. No. 91-358, 84 Stat. 473 (codified in scattered sections of 18, 28 U.S.C.), this court had general appellate jurisdiction over civil cases tried in the District of Columbia. See S.Rep. No. 405, 91st Cong., 1st Sess. 43 (Appendix) (1969). Thus the dictum in Price should be given the same weight as a similar statement by the highest court in a state on a question of that state's law. The parties have not referred us to and our own research has not revealed a decision of the District of Columbia Court of Appeals, the final judicial body under the Court Reform Act, which discusses the standard of care for physicians.
 
 
 [2]
 E. g., Smith v. Reitman, 128 U.S.App.D.C. 352, 389 F.2d 303, 304 (1967); Brown v. Keaveny, 117 U.S.App.D.C. 117, 326 F.2d 660, 661 (1963)
 
 
 [3]
 See W. Prosser, The Law of Torts § 32 at 164 & n. 59 (4th ed. 1971); Note, Medical Malpractice Expert Testimony, 60 Nw.L.Rev. 834, 834 & nn. 1-2 (1966)
 
 
 [4]
 E. g., Smothers v. Hanks, 34 Iowa 286, 11 Am.Rep. 141 (1872) (dictum); Tefft v. Wilcox, 6 Kan. 46, 63-64 (1870); Hathorn v. Richmond, 48 Vt. 557, 562-63 (1876); see T. Shearman & A. Redfield, Negligence § 436 (3d ed. 1874). A locality limitation on the standard of care of physicians has never been applied in English courts. See H. Nathan, Medical Negligence 21 (1957); Fleming, Developments in the English Law of Medical Liability, 12 Vand.L.Rev. 633, 640-41 (1959)
 
 
 [5]
 See Force v. Gregory, 63 Conn. 167, 27 A. 1116 (1893) (dictum); Burk v. Foster, 114 Ky. 20, 69 S.W. 1096 (1902) (correcting trial court's same vicinity instruction; adopting similar locality standard)
 
 
 [6]
 See Horton v. Vickers, 142 Conn. 105, 112, 111 A.2d 675, 678 (1955); Lockart v. Maclean, 77 Nev. 210, 215-16, 361 P.2d 670, 673-74 (1961)
 
 
 [7]
 See Small v. Howard, 128 Mass. 131, 132, 35 Am.Rep. 363, 365 (1880); Note, Civil Liability of a Physician for Nonwilful Malpractice, 29 Colum.L.Rev. 985, 987 (1929); Note, The Standard of Skill and Care Governing the Civil Liability of Physicians, 78 U.Pa.L.Rev. 91, 96-97 (1929)
 
 
 [8]
 See Waltz, The Rise and Gradual Fall of the Locality Rule in Medical Malpractice Litigation, 18 DePaul L.Rev. 408, 411 (1969); Note, supra note 7, 78 U.Pa.L.Rev. at 96-97 & n. 35
 
 
 [9]
 Burk v. Foster, supra, 114 Ky. at 25, 69 S.W. at 1097
 
 
 [10]
 See Note, supra note 7, 78 U.Pa.L.Rev. at 97
 
 
 [11]
 See Gramm v. Boener, 56 Ind. 497 (1877), quoted in Burk v. Foster, supra, 114 Ky. at 25, 69 S.W. at 1097
 
 
 [12]
 Warnock v. Kraft, 30 Cal.App.2d 1, 3-4, 85 P.2d 505, 506 (1938)
 
 
 [13]
 See Michael v. Roberts, 91 N.H. 499, 23 A.2d 361 (1941); Morrill v. Komasinski, 256 Wis. 417, 41 N.W.2d 620 (1950); Note, Medical Specialties and the Locality Rule, 14 Stan.L.Rev. 884, 890 n. 27 (1962)
 
 
 [14]
 See McCoid, The Care Required of Medical Practitioners, 12 Vand.L.Rev. 549, 575 (1959); Waltz, supra note 8 at 415
 
 
 [15]
 See, e. g., Horton v. Vickers, supra; Geraty v. Kaufman, 115 Conn. 563, 162 A. 33 (1932); Cook v. Lichtblau, 144 So.2d 312 (Fla.Dist.Ct.App.1962)
 
 
 [16]
 See Note, An Evaluation of Changes in the Medical Standard of Care, 23 Vand.L.Rev. 729, 732-33 & nn. 16-17 (1970)
 
 
 [17]
 Accord, Douglas v. Bussabarger, 73 Wash.2d 476, 490, 438 P.2d 829, 838 (1968) (en banc). See also Waltz, supra note 8 at 417-19
 
 
 [18]
 See Note, Medical Specialties and the Locality Rule, 14 Stan.L.Rev. 884, 887-89 & nn. 17-23 (1962). In 1962 the Board of Editors of the Standford Law Review conducted a survey of the American Specialty Boards, the American Medical Association, the American Hospital Association, publishers of medical specialty journals and medical specialty societies to determine the similarity of practice throughout the country within each recognized medical specialty. Id. The results indicated that the practice within most specialties was similar nationwide. Id. at 889. Obstetrics apparently was among the specialties with national standards. It was included within the survey inquiry and not listed among the specialties for which no conclusion was reached. Compare id. at 887 n. 19 with id. at 889
 
 
 [19]
 Among those courts which have adopted a national standard of care there has been a difference in the way they have articulated a physician's obligation. One group describes the standard with reference to the average qualified practitioner. See Brune v. Belinkoff, 354 Mass. 102, 109, 235 N.E.2d 793, 798 (1968); Pederson v. Dumouchel, supra, 72 Wash.2d at 79, 431 P.2d at 978; Shier v. Freedman, supra, 58 Wis.2d at 283, 206 N.W.2d at 174. Another group prefers to substitute the phrase "reasonably competent" for the term "average". Blair v. Eblen, 461 S.W.2d 370, 373 (Ky.1970); Shilkret v. Annapolis Emergency Hosp. Ass'n, supra, 276 Md. at 199-201, 349 A.2d at 252-53
 Perhaps there is no substantive difference in this verbal distinction. Those courts which use the word "average" may well intend it in the sense of "ordinary" or "commonly possessed". See McCoid, supra note 14 at 559. "Average" can have other meanings which should not be incorporated into a standard of care for negligence, however. It could be taken to refer to an "aggregation of the best and the worst, the experienced and the inexperienced. . . . It has never been suggested that the law strikes the average from so diverse a grouping." Waltz, supra note 8 at 409 n. 1. "Half of the physicians of America do not automatically become negligent . . . because their skill is less than the professional average." Restatement (Second) of Torts § 299A, comment e (1965). To the extent that there is a difference between the two formulations of the standard, we eschew the potential misinterpretation of "average" and follow those courts which have adopted the phrase "reasonably competent".
 
 
 [20]
 In abandoning the locality rule, we do not intend to indicate that the particular circumstances of the community wherein a physician practices could never be relevant in a suit charging him with malpractice. The availability of medical facilities, accessibility of professional consultation and the communication and transportation systems of the area are all factors for the jury to consider in the proper case. See Brune v. Belinkoff, supra, 354 Mass. at 109, 235 N.E.2d at 798; Shilkret v. Annapolis Emergency Hosp. Ass'n, supra, 276 Md. at 200-01, 349 A.2d at 253; Prosser, supra note 3, § 32, at 164. For example, a physician cannot be guilty of malpractice for failing to employ medical equipment which is not available in his community where there was no time to procure it from elsewhere. Medicine is the art of the possible. Waltz, supra note 8 at 418