746 P.2d 978

**Christie GRIMES and Gary Grimes, Plaintiffs-Respondents,**

v.

**Stephen C. GREEN, M.D., Defendant-Appellant.**

**No. 16210.**

Supreme Court of Idaho.

Sept. 23, 1987.

Rehearing Denied Dec. 3, 1987.

Quane, Smith, Howard & Hull, Boise, for appellant. Jeremiah A. Quane argued.

Ellis, Brown, Sheils & Steel, Boise, for respondents. Allen B. Ellis argued.

SHEPARD, Chief Justice.

This is an appeal from an order granting a new trial. The sole issue is whether during the trial of a medical malpractice action, the trial court erred in instructing the jury that the defendant's treatment of plaintiff should be gauged and measured by the standard of health care of the community rather than a national standard of health care. We reverse.

At the conclusion of the trial the jury was instructed that the standard of care in the local community should be used to gauge and measure defendant's treatment of plaintiff. Following a verdict of no negligence on the part of defendant, the trial court concluded his instruction was erroneous and granted a motion for a new trial.

In April 1981, plaintiff Grimes, who was approximately 35 weeks pregnant, began experiencing weakness, nausea, and back pain. When hospitalized in Blaine County Hospital, she was feverish and reported that her membranes had ruptured. No evidence indicated such rupture, and several tests to detect amniotic fluid were negative. Blood tests, however, indicated a bacterial infection. Her condition deteriorated, and Grimes was transported to Magic Valley Hospital in Twin Falls. There she was placed under the care of defendant-appellant Green, who is a board-certified obstetrician-gynecologist. Her original physician, Levin, had noted on the transfer documents, an indication of suspected amniotitis, a bacterial infection of the amniotic fluid surrounding the fetus. Upon examination of Grimes, Dr. Green detected no evidence of membrane rupture, but observed that Grimes had a bacterial infection and suspected that Grimes was suffering from amnionitis. Green placed Grimes on a treatment plan of antibiotics, and did not believe she would survive the day.

However, soon after, Grimes began having adult respiratory distress syndrome, which is a life-threatening condition that can be caused by septic shock. Green considered performing a caesarean section but, upon consultation with an internist, con-

cluded that surgery at that point would be fatal to Grimes.

Grimes continued to deteriorate rapidly, and she was transferred to LDS Hospital in Salt Lake City where there were superior intensive care and neo-natal facilities. There she was diagnosed as having septicemia caused by amnionitis. Three hours after arrival a caesarean section was performed because of Grimes' extreme condition of low blood oxygen, Adult Respiratory Syndrome, amnionitis, and fetal distress. The child was stillborn. During the caesarean, it was discovered that the amniotic fluid around the baby was foul smelling, indicating bacterial infection in the form of amnionitis. A hysterectomy was later performed to stem a continuing bacterial infection and to save Grimes' life.

Board-certified obstetrician-gynecologists testifying on behalf of plaintiff, indicated that a national standard of care existed for board-certified obstetrician-gynecologists, and opined that Green had violated that standard of care through the failure to use amniocentesis to diagnose amnionitis. Amniocentesis is a technique wherein a needle is inserted into the amniotic sac to withdraw a sample of the amniotic fluid for analysis. Defense experts, on the other hand, testified that amniocentesis was not routinely used in the Twin Falls area due to the danger that the insertion of a needle into the amniotic sac might convey into the sac bacteria from other infected tissue. Hence, they testified that the actions of Green were in conformance with the standard of care then prevailing in the Twin Falls community.

As above stated, in conformance with I.C. § 6–1012, the jury was instructed that Green's treatment of Grimes should be gauged and measured against the standard of health care in the Twin Falls community. During the time of the jury deliberations, this Court released its opinion in *Buck v.*

*St. Clair,* 108 Idaho 743, 702 P.2d 781 (1985). After a verdict in favor of defendant Green, plaintiffs filed a motion for a new trial, asserting that under the *Buck* decision the standard of care for board-certified specialists was a national standard of care rather than a local community standard of care. The trial court agreed, stating in its order that had it had the benefit of the *Buck* decision he would have instructed the jury on a national standard. Hence, the trial court granted a motion for a new trial on the *sole* basis that his instruction to the jury was erroneous in view of this Court's decision in *Buck.*

■■■ The trial judge in the instant case instructed the jury as follows:

"In any case, claim or action for damages due to injury or death of any person brought against any physician, the claimant or plaintiff must, as an essential part of his or her case in chief, affirmatively prove by direct expert testimony and by a preponderance of all the competent evidence that the defendant negligently failed to meet the applicable standard of health care practice of the community in which such care was or should have been provided as such standard existed at the time and place of the alleged negligence of the defendant physician.

"An individual physician shall be judged in comparison with similarly trained and qualified physicians of the same class in the same community, taking into account his or her training, experience and fields of medical specialization, if any.

"The term 'community' refers to that geographical area ordinarily served by the licensed general hospital at or nearest to which such care was or allegedly should have been provided."

The said instruction substantially conformed with the mandate of I.C. § 6–1012,[1]

1. **6–1012. Proof of community standard of health care practice in malpractice case.**—In any case, claim or action for damages due to injury to or death of any person, brought against any physician and surgeon or other provider of health care, including without limitation, any dentist, physicians' assistant, nurse practitioner, registered nurse, licensed practical nurse, nurse anesthetist, medical technologist, physical therapist, hospital or nursing home, or any person vicariously liable for the negligence of them or any of them, on account of the provision of or failure to provide health care or on account of any matter incidental or related

and hence, we hold that the said instruction was not erroneous.

The trial judge agreed with the assertions of the plaintiffs-respondents, repeated here on appeal, that *Buck, supra,* requires the performance of a board-certified specialist physician to be measured against a national standard rather than the statutorily mandated local community standard. We disagree. The holding of *Buck* is clearly distinguishable from the case at bar. The opening language of the decision in *Buck,* 108 Idaho at 744, 702 P.2d at 782, states: "The issue presented on appeal is whether the trial court correctly excluded pursuant to I.C. § 6–1013 the testimony of a nationally board-certified out-of-state obstetrician-gynecologist in a medical malpractice case." The trial court in *Buck* had held that the testimony of a Portland board-certified obstetrician-gynecologist was inadmissible as not conforming to the strictures of I.C. § 6–1013(c). That statute provides that an expert witness may testify in medical malpractice actions if a foundation therefor is first laid, establishing:

(c) that such expert witness possesses professional knowledge and expertise coupled with actual knowledge of the applicable said community standard to which his or her expert opinion testimony is addressed; provided, this section shall not be construed to prohibit or otherwise preclude a competent expert witness who resides elsewhere from adequately familiarizing himself with the standards and practices of (a particular) such area and thereafter giving opinion testimony in such a trial.

This Court reversed the trial court in *Buck.* 108 Idaho at 746, 702 P.2d at 784, stating:

In order to meet the requirement of I.C. § 6–1013(c) showing adequate familiarization a specialist must demonstrate two elements: first, that he is board-certified in the same specialty as that of the defendant-physician; this demonstrates knowledge of the appropriate standard of care of board-certified physicians practicing in the specialty in question. Second, an out-of-the-area doctor must inquire of the local standard in order to insure there are no local deviations from the national standard under which the defendant-physician and witness-physician were trained.

The Court held that the witness possessed actual knowledge of the applicable said community standard as required by I.C. § 6–1013(c).

In the instant case, by contrast, plaintiff offered the testimony of two expert witnesses from out of the immediate area. Each testified that they, to some extent, were familiar with the local standard of care in the Twin Falls area. Neither testified to any knowledge of a local deviation from any national standard of care. Nevertheless, both such witnesses were permitted to testify, and hence the issue in *Buck, supra,* is not presented in the instant case. Here, there was evidence that the local standard of care in Twin Falls deviated from the alleged national standard of care.

Plaintiffs-respondents argue in effect, that in cases alleging malpractice of board-certified physicians, *Buck* establishes a na-

thereto, *such claimant or plaintiff must, as an essential part of his or her case in chief, affirmatively prove by direct expert testimony and by a preponderance of all the competent evidence, that such defendant then and there negligently failed to meet the applicable standard of health care practice of the community in which such care allegedly was or should have been provided,* as such standard existed at the time and place of the alleged negligence of such physician and surgeon, hospital or other such health care provider and as such standard then and there existed with respect to the class of health care provider that such defendant then and there belonged to and in which capacity he, she or it was functioning. Such individual providers of

health care shall be judged in such cases in comparison with similarly trained and qualified providers of the same class in the same community, taking into account his or her training, experience, and fields of medical specialization, of any. If there be no other like provider in the community and the standard of practice is therefore indeterminable, evidence of such standard in similar Idaho communities at said time may be considered. As used in this act, the term "community" refers to that geographical area ordinarily served by the licensed general hospital at or nearest to which such care was or allegedly should have been provided. (Emphasis added.)

tional standard by which the actions of all such physicians will be gauged and measured, and hence there can be no local deviation from such a national standard. Such argument ignores the clear mandate of I.C. § 6–1012. In fairness to the trial court and counsel in the instant case, we perceive some of the language of *Buck* as lending some support to respondents' assertions. However, that language is *dicta*, was not necessary to the narrow holding of *Buck*, i.e., the competence of a witness to testify, and we now disavow that *dicta*.

Generally, an order granting or denying a new trial will not be overturned absent an abuse of discretion. *Luther v. Howland*, 101 Idaho 373, 613 P.2d 666 (1980). In the case at bar, however, the sole basis of the trial court's decision to grant a new trial was based upon his perception of the law as announced in *Buck, supra*. Hence, the question is not whether there was an abuse of discretion, but rather the question is one of law. *Clark v. St. Paul Property and Liability Insurance Companies*, 102 Idaho 756, 639 P.2d 454 (1981).

The order of the trial court granting a new trial is reversed, and the cause is remanded with instructions that the verdict of the jury be reinstated and judgment entered thereon. Costs to appellants.

DONALDSON and BAKES, JJ., concur.

HUNTLEY, Justice, dissenting.

A more detailed review of the facts and proceedings surrounding this case is beneficial, as the majority opinion does not fully explain the proceedings below. In April 1981, Grimes, who was approximately thirty-five weeks pregnant, began experiencing weakness, nausea and back pain. When hospitalized in Blaine County Hospital, she was feverish and reported that her membranes had ruptured. However, no evidence indicated rupture, and several tests to detect amniotic fluid were negative. Blood tests did, however, indicate a bacterial infection. Her condition deteriorated, and Grimes was transported to Magic Valley Hospital in Twin Falls. There she was placed under the care of defendant-appellant, Green, who is a board-certified Obstetrician-Gynecologist. Her original physician, Dr. Donald Levin, had noted on the transfer documents an indication of suspected amnionitis, which is a bacterial infection of the amniotic fluid surrounding the fetus. Upon examination of Grimes, Green could detect no evidence of membrane rupture, but observed that Grimes had a bacterial infection and suspected that Grimes might be suffering from amnionitis. Green did not perform amniocentesis, a process by which a sample of the amniotic fluid is extracted and analyzed. Instead, he placed Grimes on a treatment plan of antibiotics. The record indicates that, when Grimes arrived in Twin Falls, Green did not believe she would survive the day, and, in fact, failed to note any tests or results on her chart for the first three days she was in his care. The record further indicates that Dr. Green failed to conduct follow-up Gram Stains or cervical cultures, which, according to expert testimony, should have been given.

After some short-lived improvement, Grimes began experiencing Adult Respiratory Distress Syndrome (ARDS), which is a life-threatening condition that often is caused by septic shock, which, in turn, is caused by a bacterial infection. At this point, Green considered performing a caesarean section, but, upon consultation with Dr. Randall Skeem, an internist, concluded that surgery would be fatal to Grimes.

Grimes' condition continued to deteriorate, and she was transferred to the shock trauma unit of LDS Hospital in Salt Lake City where there were superior intensive care and neo-natal facilities. There she was diagnosed as having septicemia caused by amnionitis. In an effort to save her life, a caesarean section was performed and the child was stillborn. The attending physician, Dr. Stuart Wise, testified that the caesarean was performed because of Grimes' extreme condition of low blood oxygen, caused by the prolonged (two-and-a-half days) existence of Adult Respiratory Distress Syndrome and amnionitis with ruptured membranes. Additionally, fetal distress required a rapid caesarean section.

During the procedure, it was discovered that the amniotic fluid around the baby was foul smelling which indicated bacterial infection in the form of amnionitis. A hysterectomy was later performed to stem a continuing bacterial infection in the area originally infected by amnionitis and to save Grimes' life.

During trial, board-certified obstetrician-gynecologists testified as experts on behalf of Grimes and indicated that a national standard of care existed for board-certified obstetrician-gynecologists, and further testified that Green had violated that standard of care by failing to perform amniocentesis on Grimes. Defense experts testified that amniocentesis was not routinely used in the Twin Falls area. Hence, they testified that the actions of Green were in conformance with the standard of care then prevailing in the Twin Falls community.

Applying I.C. § 6–1012,[1] the trial court instructed the jury that Green's treatment of Grimes should be measured against the standard of care then prevailing in the Twin Falls community, stating:

> An individual physician shall be judged in comparison with similarly trained and qualified physicians of the same class in the same community, taking into account his or her training, experience and fields of medical specialization, if any. The term community refers to that geographical area ordinarily served by the license general hospital or at nearest to which such care was or allegedly should have been provided.

During the time the jury was deliberating, we released our opinion in *Buck v. St. Clair,* 108 Idaho 743, 702 P.2d 781 (1985). In *Buck,* we held that, for board-certified specialists, the local or community standard of care is equivalent to the national standard of care.

> We believe that for board-certified specialists, the local standard of care is equivalent to the national standard of care.... The board-certified specialists practicing within the state are the product of nationally designed education programs. The standard of care familiar to any board-certified physician in this state is the national standard of care. *Id.* at 745, 702 P.2d 781.

After ten hours of deliberation, the jury indicated confusion as to which standard to apply by sending the following question to the judge: "I think that it would help us if we could have an explanation of standard of care at Twin Falls." At this time, counsel also requested supplemental jury instructions in light of *Buck.* The trial court, however, did not instruct that a national standard of care was applicable, but instead gave the following supplemental instruction to the jury:

> You are further instructed that the standard of care in Twin Falls, Idaho, at the time in question is a fact question solely in the province of this jury to determine based upon the testimony given in open court and the instructions already given in the case.

After some more hours of deliberation, the jury returned a verdict finding no negli-

---

1. Idaho Code section 6–1012 reads in pertinent part:

   **6–1012. Proof of community standard of health care practice in malpractice case.** — ... claimant or plaintiff must, as an essential part of his or her case in chief, affirmatively prove by direct expert testimony and by a preponderance of all the competent evidence, that such defendant then and there negligently failed to meet the applicable standard of health care practice of the community in which such care allegedly was or should have been provided, as such standard existed at the time and place of the alleged negligence of such physician and surgeon, hospital or other such health care provider and as such standard then and there existed with respect to the class of health care pro-

vide that such defendant then and there belonged to and in which capacity he, she or it was functioning. Such individual providers of health care shall be judged in such cases in comparison with similarly trained and qualified providers of the same class in the same community, taking into account his or her training, experience, and fields of medical specialization, if any. If there be no other like provider in the community and the standard of practice is therefore indeterminable, evidence of such standard in similar Idaho communities at said time may be considered. As used in this act, the term "community" refers to that geographical area ordinarily served by the licensed general hospital at or nearest to which such care was or allegedly should have been provided.

gence on the part of Green. Subsequent to this verdict, Grimes moved for a new trial, which motion was granted by the trial court on grounds that its jury instructions would have been modified had it had time to analyze the *Buck* decision in depth.

At the time this Court instructed the jury in the above-entitled matter, it did not have the benefit of the *Buck* opinion. Of considerable concern to the court at the time of instructing the jury in the above matter was the applicable standard of care required of the defendant. This concern was also paramount in the minds of the jury during its deliberations. This is obvious because of the length of the deliberations and the written communication to the court regarding instruction of the applicable standard of care. *After analyzing the Buck decision, this court is convinced that had it had the benefit of the same at the time of instructing the jury, that the instructions given to the jury regarding the applicable standard of care would have been somewhat modified.* (Emphasis added.)

I begin by noting our standard of review of trial court orders granting or denying new trial is limited to ascertaining whether there has been a manifest abuse of discretion by the trial court. In the absence of such manifest abuse, the order granting or denying new trial will not be overturned.

This court is firmly committed to the rule that a trial court possesses the discretion to be wisely exercised in granting or refusing to grant a new trial and that such discretion will not be disturbed on appeal unless it clearly appears to have been exercised unwisely and to have been manifestly abused. *Dinneen v. Finch,* 100 Idaho 620, 626, 603 P.2d 575, 581 (1979).

(See also *Luther v. Howland,* 101 Idaho 373, 613 P.2d 666 (1980); *Tibbs v. City of Sandpoint,* 100 Idaho 667, 603 P.2d 1001 (1979); *Seppi v. Betty,* 99 Idaho 186, 579 P.2d 683 (1978)). Here, we have a trial court which granted a motion for new trial after having expressly stated that, after analyzing the *Buck* decision, it would have instructed the jury differently regarding the applicable standard of care. I can see no better reason for the granting of a new trial than the trial court's admission that it erroneously instructed the jury.

Green argues, and the majority opinion states, that our standard of review is inapplicable in the instant case, urging that we must review a question of law, that is, whether the trial court correctly perceived our holding in *Buck* as requiring a modified instruction on the applicable standard of care. However, Green appealed from the trial court's grant of the motion for new trial, *not* from the *Buck* decision. Additionally, the trial court did correctly perceive our holding in *Buck* that, as to board-certified specialists, the *national* standard of care would apply. *Buck* clearly expressed its holding, while also addressing the impact of I.C. §§ 6–1012 and –1013, interpreting legislative intent regarding those sections.

We believe that for board-certified specialists, the local standard of care is equivalent to the national standard of care. Our reasons for this decision are simple: board-certified medical specialists are highly trained individuals who become certified after completing a rigorous training program. Medical schools are accredited by a national team of physicians and administrators. The residency training programs are approved by a single board of specialists, and a physician is certified as a specialist only after passing a nationally administered exam consisting of both oral and written components. The board-certified specialists practicing within the state are the product of nationally designed education programs. The standard of care familiar to any board-certified physician in this state is a national standard of care.... Our holding today is limited to those physicians who hold themselves out as board-certified specialists. In so doing, we are cognizant of the intent and purpose of the passage of I.C. § 6–1012 and 6–1013.... [W]e believe the legislature, in its wisdom, recognized that the standard of care for nationally board-certified specialists was the same throughout our na-

tion.... *Buck, Id.* 108 Idaho at 745, 702 P.2d 781.

Not only did the trial court correctly interpret *Buck* as requiring a different standard of care (i.e. national) than he had instructed upon, it was well within its discretion to grant a new trial on the basis of its failure to so instruct.

In *Morrison v. MacNamara*, 407 A.2d 555 (D.C.1979), the court addressed a similar situation, holding that where a national standard of care had been adopted, it was error requiring new trial to instruct that the jury look to the standard in the local community, as such an all-encompassing error effectively precluded the jury from considering the issue on the basis of the correct standard.

"Varying geographical standards of care are no longer valid in view of the uniform standards of proficiency established by national board certification." 407 A.2d at 565.

It follows that an instruction which compares a nationally certified medical professional's conduct exclusively with the standard of care [locally] or [in] a similar community is erroneous.... [T]he trial court instructed the jury that the appellee's conduct is to be compared solely with the standard of care prevailing in Washington D.C. Thus, *in effect, the jury was instructed to ignore the testimony of appellant's expert witness on the standard of care.* This instruction was error. 407 A.2d at 565. (Emphasis added).

As in *Morrison,* the trial court's initial instruction that a local standard of care was controlling, and supplemental instruction that the standard of care "in Twin Falls, Idaho" was a question of fact for the jury, negated any prospect of the jury utilizing a national standard of care as mandated under *Buck.* As in *Morrison,* the jury was effectively instructed to ignore the testimony of Grimes' witnesses who set forth the national standard of care and indicated that Green had violated such. (See also *Robbins v. Footer,* 553 F.2d 123 (D.C.Cir.1977), wherein it was held that a trial court's instructions to the jury indicat-

ing that the defendant's conduct be compared only to practice within his own geographic community or that of a similar locality mandated a new trial where the defendant was a board-certified specialist and subject to a national standard of care. The court further held that the particular circumstances of a community (i.e. local deviations) could be relevant in a suit, but could not be outlined without first giving a correct instruction on the *national* standard of care.)

As the jury had arguably been irrevocably tainted and prejudiced against Grimes' experts by the erroneous instructions, I certainly cannot say that the trial court manifestly abused its discretion in granting a new trial. As in *Robbins,* the local community practice was given as the sole standard for the jury. I agree with the *Robbins* court that local deviations may be relevant in individual cases, but, as that court noted, it can never serve as the sole basis of an instruction, for to do so would not only ignore *Buck,* but would be a non-sequitur—there can be no "local deviations," unless there is something to deviate from (i.e. a *national* standard).

For the majority to hold otherwise is nothing more than a convoluted, indirect and sub-rosa attempt at limiting our *Buck* holding, with the trial court designated as scapegoat. Here, the trial court could do little else under the circumstances presented it and, at the very least, did not manifestly abuse its discretion in granting a new trial.

BISTLINE, J., concurs.