Yen L. SNEAD, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 81–2549.

United States District Court, District of Columbia.

Sept. 28, 1984.

Ira S. Saul, Saul & Barclay, Fairfax, Va., for plaintiffs.

Diane M. Sullivan, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Plaintiffs Yen L. Snead and Jack R. Snead bring this medical malpractice action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*, alleging negligence in medical services performed by defendant's agents. Specifically, plaintiffs claim that Drs. Joseph Sheffery and Thomas Wilson, both gynecologists performing medical services for the United States Department of State Health Clinic in 1979, failed to practice medicine in accordance with the required standard of care in their examinations of the female plaintiff, Yen Snead. The Sneads further allege that those physicians' departure from the required standard of care resulted in their failure to detect Yen Snead's existent but preinvasive cervical cancer and was a substantial factor bringing about the progression and metastasis of that malignancy. Plaintiffs seek recovery of Yen Snead's current and future medical expenses as well as special damages including compensation for lost future income and the value of her homemaking services, compensation for her physical, mental and psychological suffering and Jack Snead's loss of consortium and anguish, and payment of monies lost as a result of the female plaintiff's inability to live overseas.

Plaintiff Yen Snead is a thirty-eight year old American citizen of Vietnamese birth. She is the wife of plaintiff Jack Snead, a civil engineer employed by the Agency for International Development ("AID"), an agency of the United States Government, and by virtue of her marriage is covered by the Department of State Medical Program and its regulations concerning medical examinations and treatment for AID employees and their dependents. Stip. 4–6. She is the mother of two children, whose ages were 13 and 19 at the time of trial.

The Sneads married in Vietnam on January 17, 1973 and left that country in July, 1974 when Jack Snead was assigned to an AID post in Yemen. Two years later they moved to an AID post in Egypt, where they lived until 1980. Since 1980 they have lived in the United States.

Prior to 1978, Yen Snead enjoyed good health and had no known gynecological problems. However, in 1978 her menstrual periods became heavier and increased in length from five days per month to six or seven days per month. At the recommendation of a nurse at the State Department Clinic in Cairo, Egypt, Mrs. Snead had a Papanicolaou smear ("pap smear") taken at that clinic on November 21, 1978, for the purpose of detecting the presence or absence of gynecological pathology. The specimen was submitted to a State Department gynecologist, who interpreted the pap

smear as "Negative Class I" with a low estrogen reading.

On June 29, 1979, while in the United States on home leave, the plaintiff visited the State Department Health Clinic ("the Clinic") in Washington, D.C. for her routine and required World Wide Medical Clearance physical examination.[1] She told the examining physician of her excessive and prolonged menstrual bleeding, and he, an internist by specialty, referred her back to the State Department Office of Medical Services for that office to arrange for a gynecological examination. The Office of Medical Services referred Mrs. Snead to Joseph Sheffery, M.D., a gynecologist performing medical services for the Clinic. Stip. 11.

Dr. Sheffery performed a gynecological examination of Yen Snead on July 2, 1979, in response to her specific complaint of excessive and prolonged bleeding with her menstrual period. As will be discussed below, the thoroughness of that examination is the subject of dispute; however, the parties fully agree that Dr. Sheffery neither performed a pap smear nor ordered a pap smear to be taken. Stip. 12. After examining Mrs. Snead, Dr. Sheffery reported his findings in her clinical record as follows:

> Uterus fibrotic but no tumor found. Suggest Provera [an oral synthetic progesterone compound] 10 mg. daily [beginning on the 16th day of the patient's menstrual cycle] and see if helps [—] if so repeat Provera 1 month [—] if not relieved should have diagnostic curettage.

In accordance with his consultation notes, Dr. Sheffery prescribed for Yen Snead medroxyprogesterone acetate tablets (Provera) to be taken orally. A nurse at the Clinic scheduled Mrs. Snead for a follow-up gynecological visit on July 30, 1979. Stip. 17–20.

Dr. Thomas A. Wilson, M.D., a gynecologist who was at that time associated with Dr. Sheffery and who also provided services to the Clinic, performed the July 30 follow-up examination of Mrs. Snead at the Clinic. At that visit, Dr. Wilson noted that Mrs. Snead's problem of excessive menstrual bleeding had been arrested by the Provera and that no further treatment was necessary. Stip. 21–24. He did not recommend or arrange for follow-up treatment of Mrs. Snead overseas. PX–1, p. 52, Dep. of Yen Snead at 39. Based on the medical record, including the examinations of Doctors Sheffery and Wilson, the State Department Office of Medical Services granted Yen Snead Class I World Wide Medical Clearance on July 31, 1979. Stip. 25.

Following the grant of World Wide Medical Clearance, Yen Snead returned to Cairo, Egypt, the location of her husband's AID assignment. According to her testimony, she continued to take Provera (brought from the United States) for a "couple of months" and experienced light periods when using the Provera but increased menstrual flow when not. In early 1980, Mrs. Snead began to experience postcoital bleeding and on March 12, 1980 she visited the American Embassy clinic in Cairo with complaints of abnormal bleeding. The record of the nurse who received Mrs. Snead's complaint states the following:

> Complains of heavy, irregular periods. Has been on Provera—prescribed by Gyn doctor in U.S. Was told D & C should be accomplished if no improvement. Now experiencing some spotting after intercourse. Referred to Dr. Younis. [Stip. 30].

The Egyptian gynecologist to whom Mrs. Snead was referred recommended that she undergo a diagnostic curettage. Worried that the facilities at his office did not appear to be sterile, Mrs. Snead asked the referring nurse at the Embassy clinic what options were available, and was advised that she could travel to Germany or the United States for the curettage. Hoping to minimize disruption to her family, and with

---

1. AID employees and their dependents are required to undergo a biennial physical examination by and through the Department of State Office of Medical Services to gain medical clearance for overseas assignment. Stip. 8.

the approval of the Embassy clinic nurse, Mrs. Snead decided to postpone the procedure until after her youngest child's school year ended. She returned to the United States in July, 1980 and was examined by Dr. George Speck, a gynecologist, on July 29, 1980. Dr. Speck explored Mrs. Snead's pelvic organs both bimanually and using a speculum, and in the course of his examination located a cervical lesion of unknown nature. Two days later, at Alexandria Hospital, in Virginia, Dr. Speck removed tissue from Mrs. Snead's cervix; a biopsy was performed. The pathology report revealed the presence of a cervical tumor, measuring $2.5 \times 3$ cm., described as a "poorly differentiated adenocarcinoma of the cervix, Stage I–B." Stip. 33. Dr. Speck referred Mrs. Snead to George Washington University Medical Center and Larry McGowan, M.D. On August 26, 1980, Dr. McGowan performed a radical hysterectomy, pelvic lymphadenectomy, and salpingo-oophoectomy on Mrs. Snead, and the accompanying pathology report contained the following diagnosis: "Cervix: poorly differentiated adenocarcinoma (glassy cell carcinoma)." Stip. 34–35. After the hysterectomy, Mrs. Snead returned to Dr. McGowan for follow-up examinations at 3-month intervals and took medication to relieve pelvic pain for approximately 1½ months. In January, 1983, Dr. McGowan changed the interval of her follow-up examinations to 6 months. Less than three months later, in March 1983, Mrs. Snead consulted another physician with complaints of chest pain, and that physician took a series of chest and lung x-rays, revealing a spot on Mrs. Snead's right lung. Yen Snead was referred back to the George Washington University Medical Center, where she was hospitalized and underwent extensive (and sometimes painful) diagnostic procedures, including a lung tissue biopsy. On or about April 14, 1983, it was determined that Mrs. Snead suffers from malignancies in the lung extending into the mediastinal lymph nodes. Stip. 43. The histology of that lung carcinoma is consistent with metastasis from the uterine cervical carcinoma removed surgically in 1980. Stip. 41–44.

Since May 1983, Mrs. Snead has repeatedly undergone chemotherapy and radiation therapy in an attempt to arrest the spread of her cancer. She continues to suffer not only from the physical side effects of those treatments but also from emotional distress; she takes sleeping pills and anti-depressant medications regularly. Both Sneads testified that their sexual relations have been "drastically reduced" as a result of her illness, Tr.Vol. 3–A, pp. 17, 34. Jack Snead testified at length that his wife's illness had devastated the relationship they once enjoyed as husband and wife. Tr.Vol. 3–A, pp. 6–34. Because of her ongoing need for oncological care, Yen Snead has been denied unrestricted World Wide Medical Clearance since July 27, 1982. She is cleared to travel only to those overseas posts with adequate oncological medical facilities, none of which are posts to which Jack Snead would likely be assigned in light of his seniority and job expertise. Stip. 36–40. Because of her condition, the Sneads have remained in the United States since 1982 despite Mr. Snead's eligibility for overseas assignment.

In this action for medical malpractice plaintiffs contend that defendant's doctors failed to treat the female plaintiff with that degree of skill, care, or knowledge required of a doctor, which, in turn, resulted in her injury. Essentially, plaintiffs allege that the acts and omissions of defendant's agents involved in the medical care of Mrs. Snead constitute actionable negligence.[2] The specific issues presented at trial were (1) whether the gynecological services provided by Drs. Sheffery and Wilson on July 2, 1979 and July 30, 1979 fell below required standards of care and, if so, (2) whether the failure of Drs. Sheffery and

---

2. As is required under the Federal Tort Claims Act, plaintiffs sought redress of their claim through administrative processes: their claim for administrative settlement with the United States Department of State for one million dollars and two million dollars, respectively, was denied by the Department of State. Stip. 52–53.

Wilson to comply with required standards of care proximately caused Yen Snead's injuries.

■■■ The plaintiffs bear the burden of presenting evidence "which establishes the applicable standard of care, demonstrates that this standard has been violated, and develops a causal relationship between the violation and the harm complained of." *Kosberg v. Washington Hospital Center, Inc.,* 394 F.2d 947, 949 (D.C.Cir.1968), quoted in *Haven v. Randolph,* 494 F.2d 1069, 1070 (D.C.Cir.1974). The standard of care by which the defendant's conduct is measured in ordinary negligence cases is that which is reasonable under the circumstances, *Washington Hospital Center v. Butler,* 384 F.2d 331, 335 (D.C.Cir.1967). It is also applicable in the law of professional negligence, requiring those with special training and experience to conform to conduct commensurate with such qualifications.

■■■ In medical malpractice, which transfers ordinary negligence elements to medical diagnosis and treatment, the duty of care is that degree of reasonable care and skill expected of members of the medical profession under the same or similar circumstances.

Medical standards are largely nationalized through national board certification. The federal courts of the District of Columbia have, for some time, applied the national standard of care to board certified specialists. *See Robbins v. Footer,* 553 F.2d 123 (D.C.Cir.1977). Recently the District of Columbia Court of Appeals replaced the "locality rule", holding that as to board certified physicians and hospitals, *inter alia,* the standard of care is to be measured by the national standard. *Morrison v. MacNamara,* 407 A.2d 555, 565 (D.C. App.1979).[3]

■■■ Nationally-certified specialists in gynecology, like Drs. Sheffery and Wilson, are required to have and to exercise that degree of care, skill and learning ordinarily possessed and used by a nationally-certified specialist in gynecology acting in the same or similar circumstances. *See Morrison v. MacNamara, supra; Robbins v. Footer, supra.*

A plaintiff asserting medical malpractice must "affirmatively prove the relevant recognized standard of medical care exercised by other physicians and that the defendant departed from that standard when treating the plaintiff." *Robbins v. Footer,* 553 F.2d at 126, citing *Price v. Neyland,* 320 F.2d 674, 677 (D.C.Cir.1963).

■■■ Due to the technical complexity of the case (as in many malpractice actions), the general rule is that expert testimony is required to support a claim that defendant's conduct did not meet the applicable standard of care. *Robbins v. Footer,* 553 F.2d at 126–127. Although a physician need not be a specialist in the field of which he speaks in order to testify, *Baerman v. Reisinger,* 363 F.2d 309 (D.C.Cir.1966), and specialization goes to the weight rather than to the admissibility, in order to give an opinion on whether the defendant complied with the applicable standard of care, the witness must be familiar with that standard. The qualifications of the witness are weighed by the court and a determination made as to whether he is qualified to express an opinion on the subject. *Sher v. DeHaven,* 199 F.2d 777, 782 (D.C.Cir.1952), *cert. denied,* 345 U.S. 936, 73 S.Ct. 797, 97 L.Ed. 1363 (1953).

As mentioned before, the particulars of Dr. Sheffery's July 2, 1979 examination of Yen Snead are in dispute. For example, Yen Snead testified that Dr. Sheffery did not perform a bimanual or speculum pelvic examination, but only palpated her abdomen to feel for lumps or tumors. Although he had no clear memory of the details of that examination of Mrs. Snead, Dr. Sheffery claims that he routinely includes bimanual and speculum pelvic exam-

---

**3.** Under the Federal Tort Claims Act, liability is determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b) (1976). Accordingly, the liabil- ity of the United States depends on an application of District of Columbia law. *See Hernandez v. United States,* 636 F.2d 704, 706 n. 5 (D.C.Cir.1980).

inations as part of an overall gynecological examination, and reasons that without having done so, he could not have concluded and recorded that Mrs. Snead's uterus was fibrotic. Furthermore, Mrs. Snead recalls that Dr. Sheffery examined her breasts, but Dr. Sheffery has testified that breast examinations are conducted by other physicians at the Clinic, but not by him. These matters need not, however, be resolved since this cause can be determined through focus on the legal consequences of the *undisputed* facts that (1) Dr. Sheffery's examination of Mrs. Snead did not include a pap smear, (2) Dr. Sheffery instituted, and Dr. Wilson continued, Provera treatment to relieve Yen Snead's condition of heavy and frequent menses, and (3) neither Dr. Sheffery nor Dr. Wilson advised Mrs. Snead to seek follow-up care after the Provera treatment regardless of the apparent effect of that drug.

■ At trial, plaintiffs presented the highly persuasive testimony of Herbert A. Goldfarb, M.D., an expert in the field of obstetrics and gynecology with experience as an Army physician and in private practice. In response to a hypothetical question, Dr. Goldfarb testified that a gynecologist treating a patient with Yen Snead's history and complaints would deviate from proper medical standards by proceeding with Provera treatment instead of performing diagnostic tests (including a Pap smear) to detect cytological causes of Mrs. Snead's menstrual problems. According to Dr. Goldfarb, prolonged and heavy menstrual bleeding is a "prime sign" of some abnormality occurring in the gynecological tract, and use of the drug Provera, which may well mask the presence of gynecological cytology, is contraindicated in cases of abnormal bleeding. Tr.Vol. 2–A pp. 8–9. Dr. Goldfarb's testimony is supported by other evidence (the Provera package insert and pages of *Physician's Desk Reference,* 33rd ed., 1979; PX–2C) and is further buttressed by the testimony of Dr. Barry Singer, another expert in the field of gynecology. Defendant's expert witness, Dr. Robert C. Park, testified that use of Provera as a therapeutic test in Mrs. Snead's case comported with the applicable standard of care. The totality of the record on this issue, by the preponderance of the evidence, compels the conclusion that a reasonably competent gynecologist presented with Mrs. Snead's symptoms and menstrual history would have ruled out the possibility of bleeding caused by organic pathology *before* prescribing Provera.

While this conclusion could be reached without more support, nonetheless it is additionally fortified here by State Department and AID regulations, standards and guidelines governing examinations for purposes of World Wide Medical Clearance.[4] Considered as a whole, those regulations and the implementing standards and guidelines direct that a pap smear is a required element of any World Wide Medical Clearance examination of a female AID employee or dependent age 21 or over. In light of that requirement, Dr. Sheffery's belief that Yen Snead's condition was treatable with Provera provides no justification for his decision to forego the required pap smear. Finally, the fact that Mrs. Snead's last prior pap smear predated the July 2, 1979 examination by only eight months does not excuse Dr. Sheffery's failure to perform the same test. Although medical literature current in 1979 advised annual pap smears as a *screening* procedure, the evidence presented at trial indicates that a pap smear for *diagnostic* purposes is indicated whenever a patient presents symptoms suggesting possible abnormal cytology of

---

**4.** Those standards are found in the following manuals:

    a. Volume 3 *Foreign Affairs Manual* §§ 680–688;

    b. Form FS–436, Guidelines for the Examining Physician;

    c. Medical Examination Standards for the Foreign Service;

    d. Form DS–1686, now known as Optional Form 264, Medical History and Examination for Foreign Service.

The parties have stipulated that these regulations are authentic and were in place in 1979. Stip. 7.

the gynecological tract. In sum, the preponderance of the evidence shows that Dr. Sheffery's and Dr. Wilson's failure to obtain a pap smear and their use of Provera as the sole treatment for Mrs. Snead's abnormal bleeding in July, 1979 did not satisfy the standard of care governing board-certified gynecologists at that time. Their breach of the duty of care was compounded by their failure to specifically direct Yen Snead to seek further treatment, regardless of apparent improvement, in light of the possibility that Provera could mask gynecological abnormalities.

Plaintiffs must next prove that the treatment Mrs. Snead received in July, 1979 was the proximate cause of her injuries. *See Johnson v. United States*, 547 F.2d 688, 692 (D.C.Cir.1976). In cases involving alleged medical mismanagement of a patient's existing and potentially fatal condition, the appropriate test for causation is the "substantial factor" test. Under this test, plaintiffs must show that the defendant's deviation from the standard of care was a "substantial factor" bringing about Mrs. Snead's present condition. *Daniels v. Hadley Memorial Hospital*, 566 F.2d 749, 757 (D.C.Cir.1977). In applying the "substantial factor" test the Court "must at least take into account both the patient's chances of survival [had she been properly treated] and the extent to which defendant has interfered with those chances [by departing from the standard of care]." *Id.* at 758.

The first inquiry in the causation analysis is whether in July 1979 Yen Snead had a discoverable and potentially fatal condition which Drs. Sheffery and Wilson failed to detect. Defendant, supported by the testimony of Dr. Park, argues that even had Drs. Sheffery and Wilson performed diagnostic tests to determine the cause of Yen Snead's bleeding, they could not have prevented the cancer from which she now suffers, because it was not present at that time. Specifically, defendant argues that there is no evidence that Mrs. Snead's specific form of cancer, poorly differentiated

glassy-cell adenosquamous carcinoma, passes through a recognizable prolonged preinvasive state which could have been detected by cervical cytology in 1979.

Refuting that contention, a host of credible physicians testified, including Myron R. Melamed, M.D., the Chairman of the Pathology Department at Memorial Sloan-Kettering Cancer Center in New York, Margrit A. David-Nelson, M.D., the pathologist who examined the cervical tumor removed from Yen Snead on July 31, 1980, George Speck, M.D.,[5] the surgeon who removed that tumor, and Drs. Goldfarb and Singer. The totality of that testimony, as summarized below, establishes that the nature, size and growth rate of the malignancy removed from Yen Snead's cervix is not consistent with the rapidly invasive growth envisioned by Dr. Park.

Dr. David-Nelson testified that her examination of representative samples of the polypoid mass surgically removed in 1980 revealed that it originated in a benign adenomatous endocervical polyp. Tr.Vol. 5, pp. 165–66. Over time, malignant cells replaced the normal tissue of that polyp, transforming it into the adenoepidermoid carcinoma removed by Dr. Speck. Tr.Vol. 5, p. 166. Dr. Speck confirmed the pathologist's testimony as to the size of the mass he removed (approximately three centimeters or 1½ inches in diameter) and further described it as a pedunculated, movable lesion (arising from the surface of the cervix on a stalk) large enough to obscure the opening of the cervix. Tr.Vol. 5, pp. 159–161. Based on the size of the lesion, Dr. Speck testified that "it had been there for some time" before being removed. *Id.* at 161.

The critical question is how long Yen Snead's polyp had been present; that is, whether it could and should have been discovered in July, 1979. Based on the growth process (staging) and doubling time (rate of growth) of adenoepidermoid tumors, Dr. Goldfarb stated, with reasonable medical certainty, that some sign or symp-

**5.** Dr. Speck testified as a factual witness rather than as an expert.

tom of Mrs. Snead's cancer was discoverable in July, 1979. Tr.Vol. 2–A, pp. 24–25. This testimony is consistent with that of Dr. Melamed, that invasive cervical cancer such as Mrs. Snead's exists "in situ" at the surface epithelium for "some period of time" before progressing to invasion of the underlying connective tissue. Melamed Dep. at 16.[6] This conclusion corroborates the testimony of Dr. Singer, who held the opinion that Yen Snead's cervical carcinoma "certainly was present", at least *in situ*, in June of 1979. Tr.Vol. 2–A at 51.

Other relevant testimony as to the growth rate of Yen Snead's cancer supports plaintiffs' case as well. Defendants do not contest (and in fact their own expert witness agrees) that the growth rates of Mrs. Snead's primary and metastatic adenoepidermoid carcinoma would be roughly equivalent, and evidence indicates that the tumor cells which metastasized from Yen Snead's cervix to her lung and mediastinum did not display rapid growth: as late as April, 1982, 20 months after removal of the primary cervical cancer, the metastatic tumors were still too small to appear on a chest x-ray. *See* PX–1, p. 148 and Report of E. Grant, M.D. contained in PX–1. Those facts simply do not support Dr. Park's conclusion that Mrs. Snead's polyp transformed from an undiscoverable benign polyp to an enlarged and invasive adenoepidermoid carcinoma in less than a single year.

Finally, Dr. Park's reliance on literature from the American College of Obstetrics and Gynecology to the effect that cervical *adenocarcinoma* is not preceded by a prolonged preinvasive stage is of no assistance in this matter since Yen Snead's form of cancer is not a adenocarcinoma but rather an adenoepidermoid or adenosquamous variety, bearing traits of squamous cell carcinoma as well. The growth process describ-

ed by Drs. Melamed and Singer accounts for the nature of that tumor.

The weight of the testimony capsulized above compels the conclusion, through credible and persuasive testimony offered with reasonable medical certainty, that in July, 1979, Yen Snead's cervical carcinoma existed in some preinvasive and discoverable stage. Given that Mrs. Snead already suffered from a potentially fatal condition in July, 1979, the issue is whether the actions and omissions of Drs. Sheffery and Wilson substantially contributed to her present condition. *See Daniels v. Hadley Memorial Hospital*, 566 F.2d at 757.

We look first to the likely effect of timely proper treatment. Dr. Barry Singer stated unequivocally that

a pap smear properly performed at that time [July, 1979] would have revealed the presence of abnormal cells, leading to a more complete examination of the cervix which would have included curettage or biopsy, to determine the source of the abnormal cells .... Within reasonable medical probability, a curettage at that time would have been curative, since the tumor, by definition, would have been smaller at that time. Assuming growth of these tumors to be sequentially over time and metastases to occur after a tumor grows to a certain size, at that time the tumor would have been confined to the cervix, would not have metastasized, and should have been curable by curettage.

Tr.Vol. 2–A p. 51. Dr. Singer's conclusion was confirmed by the testimony of Dr. Goldfarb:

[W]ith reasonable medical certainty it's my opinion that the subsequent cancer that was found in Mrs. Snead would have been picked up at the time or its precursors would have been picked up [upon

**6.** The deposition of Dr. Melamed was presented at trial on videotape. While Dr. Melamed does not appear to concur with the opinion that Mrs. Snead's tumor originated in a polyp, he assumes that its source was a lesion in the wall of the cervix. The Court accepts the testimony as to the polypoid nature of the mass presented by

Drs. Speck and David-Nelson. To the extent that Dr. Melamed disagrees with their view (and he does not expressly refute it), that difference of opinion has no bearing on his testimony as to the staging and metastasis of adenoepidermoid carcinomas. That testimony is relevant, uncontroverted, and valuable.

performance of a dilatation and curettage] in 1979. It would have established the nature of the cells of the uterus, it would have ruled out upper uterine pathology and if, as was described in the pathology report, the cancer was growing in a polyp and the polyp was present in the endocervix the polyp would have been removed and she would have been cured and not required a hysterectomy and her life would not have been in danger.

*Id.* at 22. Given that the decision to forego a pap smear, dilatation and curettage, or other means of testing Yen Snead's cervical tissue for malignancies rested with Drs. Sheffery and Wilson, it is clear that their selected course of treatment, which deviated from the standard of care, was a substantial factor bringing about the progression of Yen Snead's cervical cancer. Furthermore, overwhelming evidence in the record indicates that Mrs. Snead's lung and mediastinal carcinomas are metastases from the primary cervical cancer. *See e.g.,* Melamed Dep. at 10–15; Testimony of Oliver Alabaster, M.D., at Tr.Vol. 3 pp. 2–5. As early detection of the primary carcinoma at the preinvasive stage [7] would have allowed its removal before the occurrence of metastasis through the blood stream, the medical decisions made by Drs. Sheffery and Wilson must be viewed as a substantial factor bringing about the development of Mrs. Snead's lung and mediastinal cancer as well. Accordingly, defendant's liability for plaintiff's injuries relating to her cervical, lung and mediastinal cancer is established by a preponderance of the evidence.

■ Remaining for resolution by the Court is the measure of plaintiffs' recoverable damages. The parties have stipulated that the medical expenses of Yen Snead incurred and documented as of the date of trial, in the amount of $48,647.00, will be accepted without dispute as reasonable and necessary. Stip. 49. Based on the reasoned and persuasive testimony of Dr. Oliver Alabaster as to Mrs. Snead's life expectancy and anticipated medical needs, including the likelihood of future radiation therapy, chemotherapy and surgery, Tr. Vol. 3 at 10, the future medical expenses, including chemotherapy costs incurred but not yet billed, are estimated at $38,342.00.

In addition, plaintiffs seek recovery of the following nonmedical economic losses:

(a) Yen Snead's lost future income (recoverable, if proven, under *District of Columbia v. Barriteau,* 399 A.2d 563 (D.C. App.1979));

(b) the value of Yen Snead's lost homemaking services;

(c) losses resulting from the Sneads' inability to live overseas, including:

1. state income taxes paid by the Sneads which would not have been assessed had they lived overseas;

2. the fair rental value of the Sneads' home (stipulated at $600/month in 1983, Stip. 58) which they would have gained had they lived overseas with furnished housing; and

3. overseas hardship allowance ("post differential") or economic value of retirement benefits for which Jack Snead would have been eligible had the Sneads lived overseas.

The testimony presented at trial, particularly that of plaintiff Jack Snead, establishes that each of the losses itemized above has been incurred as a direct consequence of Yen Snead's illness, inability to perform her accustomed functions and inability to travel overseas. The non-medical economic losses have been discounted to present value at a rate of 6.5%. Plaintiffs' economic expert totaled those losses, using four different sets of assumptions as to Yen Snead's life expectancy and Jack Snead's election of a post differential or retirement benefits had he been assigned overseas after 1982. *See* PX–18, 18A. In light of Dr.

---

**7.** Dr. Goldfarb's testimony indicates that the cervical lesion had reached the stage of "significant invasion" by the time that Yen Snead began to experience postcoital spotting in the spring of 1980. Tr.Vol. 2–A, pp. 24–25.

Alabaster's testimony that, at the time of trial, the likelihood of Yen Snead's survival beyond late 1985 was less than 50% (Tr.Vol. 3, p. 8) (that is, that it is more likely than not that she will not survive beyond the year 1985), we focus on those damages incorporating an assumption of Yen Snead's death in 1985 rather than those (higher) figures assuming death in later years. Adding those values to the total current and projected medical expenses, the testimony overwhelmingly reflects total economic losses approximating $380,000.

Additionally, compensation is warranted for the extraordinary pain and suffering of the plaintiff, Yen Snead. No one challenges the depth of pain and suffering of this young woman who awaits, tragically, the certainty of death, if not imminent, then more likely than not, within the next year. Deprived of a viable marital relationship with his wife, Jack Snead is entitled to substantial compensation for his loss of consortium, which embraces not only the loss of the services of his wife, the loss of her active social and personal companionship, but also the impact on the expression of love, affection and sexual relations. In short, he is entitled to compensation for such loss to him.

Accordingly, judgments shall be entered herein, on the accompanying Judgment, in favor of the plaintiffs and against the defendant.

### JUDGMENT

In consideration of the Memorandum Opinion of this date, the 28th day of September, 1984,

Judgment be and it hereby is entered in favor the plaintiff, Yen L. Snead, and against the defendant, United States of America, in the amount of $1,200,000.

Judgment be and it hereby is entered in favor of plaintiff, Jack R. Snead, and against defendant, United States of America, in the amount of $200,000.