Anthony A. STOKES, Plaintiff,

v.

CHILDREN'S HOSPITAL,
INC., Defendant.

Civ. A. No. 90–0137.

United States District Court,
District of Columbia.

Nov. 4, 1992.

R. Kenneth Mundy, Karen E. McDonald, Mundy, Holt & Mance, P.C., Washington, D.C., for plaintiff.

Gary Brown, Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

This matter is before the Court pursuant to defendant Children's Hospital's post-trial Rule 50(b) motion for entry of judgment as a matter of law. After considering defendant's motion, plaintiff's opposition, and defendant's reply, we hold that plaintiff failed to present sufficient evidence to support a reasonable finding of negligence and causation and, therefore, grant defendant's motion.

### I. *Background*

This action arose out of a medical malpractice suit brought by plaintiff Anthony Stokes. On July 27, 1978, when plaintiff was thirteen years old, he experienced seizures and fainting and was taken to Group Health Association, Inc. ("GHA"). While in GHA's offices, plaintiff had two further seizures. The GHA treating physicians referred plaintiff to the Children's Hospital for further neurological tests, including a computer assisted tomoscope ("CAT scan") and a cerebrospinal fluid tap.

At Children's Hospital, Mr. Stokes was evaluated by several doctors, including Dr. Myriam Davis, a consulting neurologist called in to perform a follow-up neurological evaluation. Dr. Davis noted a heart murmur and an orbital bruit, a murmur over the carotid and ophthalmic arteries, and ordered a CAT scan, an EEG, and a cardiac evaluation. Dr. David Brallier, a radiologist at Children's Hospital, performed the CAT scan and reported the results as normal. Mr. Stokes was discharged the following day from Children's Hospital with a diagnosis of unknown etiology.

Following his discharge from the hospital, plaintiff was treated by GHA for a period of five years with daily dosages of dilantin, an anti-convulsive drug. Plaintiff had five seizures during that time. In 1988, after another four seizures, plaintiff underwent another CAT scan at Howard University Hospital, which revealed a large arteriovenous malformation ("AVM")[1] of approximately six centimeters. Because of its size, the AVM was deemed inoperable and plaintiff was put on proton beam radiation therapy. The results of that therapy are still undetermined.

Plaintiff filed suit, alleging that defendant Children's Hospital was negligent in failing to diagnose and treat the AVM in 1978. Plaintiff also named GHA as a defendant, and GHA joined the GHA treating physicians Dr. Morris Osborne and Dr. Judith Hogg as third-party defendants.

Plaintiff's theory, with respect to Children's Hospital, was two-fold. First, plaintiff alleged the CAT scan revealed an AVM of two centimeters and that Dr. Brallier, the hospital radiologist, had violated the standard of care in interpreting the scan as normal. Second, plaintiff maintained that Dr. Davis, the consulting neurologist, had violated the standard of care in failing to order a follow-up CAT Scan and arteriogram. This failure, according to plaintiff, prevented an early detection of the AVM and possible surgery to obliterate the AVM.

The case went to trial before a jury on June 22, 1992, which resulted in a deadlock on July 6, 1992, at which time the Court declared a mistrial. Before the case was submitted to the jury, we granted the directed verdict motions to dismiss defendants GHA and the GHA doctors, but denied defendant Children's Hospital's motion for a directed verdict. Defendant Children's Hospital timely filed this motion for entry of judgment as a matter of law following the trial. This Court held a hearing on the motion on October 16, 1992.

### II. *Discussion*

#### A. Jurisdiction

■ Judgment as a matter of law is appropriate when, at the close of all evidence, the court finds the evidence is so one-sided that the moving party must prevail as a matter of law. Fed.R.Civ.P. 50(b); *Richardson v. Richardson–Merrell, Inc.,* 857

---

1. An AVM is a malformed blood vessel, which is usually a congenital condition. If strain is placed on the vessel, it can rupture and cause bleeding and may also cause seizures.

F.2d 823, 827 (D.C.Cir.1988), *cert. denied,* 493 U.S. 882, 110 S.Ct. 218, 107 L.Ed.2d 171 (1989). A court must order a new trial, however, "if reasonable minds could differ about the facts." 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2537 (1971 & Supp.1992).

■ Plaintiff argues that entry of judgment as a matter of law is procedurally inappropriate for three reasons. First, plaintiff contends that the former denial of defendant's motion for a directed verdict stands as the law of the case, preventing this Court from considering defendant's subsequent motion for entry of judgment as a matter of law. We find plaintiff's argument to be groundless. The Court is not bound by its denial of a motion for directed verdict in considering the post-trial motion. "The court may expressly reserve decision on the motion for directed verdict but it will be deemed to have reserved decision even if it has denied the motion." *Id.*

Plaintiff argues, secondly, that the Court may not grant defendant's motion after remarking to the jury, in response to a question from the jury, that there was some evidence on both sides regarding the standard of care. Again, plaintiff's argument that such comment serves as the law of the case is without any support. This comment is far short of a finding that a standard of care has been shown by sufficient evidence.

■ Finally, plaintiff has suggested that the Court lacks jurisdiction to consider defendant's motion after a mistrial was declared. Rule 50(b), however, clearly states that *"if no verdict was returned,* the court may, in disposing of the renewed motion, direct the entry of judgment as a matter of law or may order a new trial." Fed. R.Civ.P. 50(b) (emphasis added). *See also Noonan v. Midland Capital Corp.,* 453 F.2d 459, 462 (2d Cir.1972), *cert. denied,* 406 U.S. 945, 92 S.Ct. 2044, 32 L.Ed.2d 333 (1972) (ruling for defendant as a matter of law after the jury twice reported itself deadlocked); *Gonzalez v. Avon Prods., Inc.,* 648 F.Supp. 1404, 1407 (D.Del.1986), *aff'd,* 822 F.2d 53 (3d Cir.1987) (ruling that

jury's failure to reach a verdict in this case did not bar defendant's motion); *Street v. Hedgepath,* 607 A.2d 1238, 1244 (D.C.App. 1992) (holding that express language of Rule 50 gave trial court jurisdiction to grant motion after mistrial declared).

For the above reasons, this Court therefore has jurisdiction to consider defendant's motion for entry of judgment.

**B. Legal Claims**

■ In moving for entry of judgment, it is well settled that defendant must show that a jury could not reasonably find that plaintiff has satisfied every element of its claim. In a malpractice claim, plaintiff must prove, by a preponderance of the evidence, three elements: 1) the applicable standard of care; 2) that this standard has been violated; and 3) that there is a causal relationship between the violation and the injury. *See, e.g., Kosberg v. Washington Hospital Center, Inc.,* 394 F.2d 947, 949 (D.C.Cir.1968); *Morrison v. MacNamara,* 407 A.2d 555, 560 (D.C.App.1979). Ordinarily, in establishing these elements, plaintiff must provide expert testimony on all three elements, unless the matter is wholly in the realm of "ordinary human knowledge." *Canterbury v. Spence,* 464 F.2d 772, 791–92 (D.C.Cir.), *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972). In ruling upon defendant's motion for entry of judgment, the Court is required to give plaintiff the benefit of every legitimate inference unless it is clear that reasonable men could reach but one conclusion. *Corley v. B.P. Oil Corp.,* 402 A.2d 1258, 1263 (D.C.1979). *See also Richardson,* 857 F.2d at 827.

In the case at hand, defendant Children's Hospital contends that judgment as a matter of law is appropriate because plaintiff's case against the hospital is deficient on all three grounds. Specifically, defendant alleges that plaintiff's expert witness has failed to show that either Dr. Brallier, the hospital radiologist, or Dr. Davis, the consulting neurologist, deviated from an established standard of care or that such deviation caused plaintiff injury.

## 1. Standard of Care

■ Plaintiff's only testimony at trial with respect to both standard of care and causation was presented by one expert witness, Dr. Nagbhushan Rao, a neurologist affiliated with the D.C. General Hospital and Howard University who had performed several diagnostic tests on Mr. Stokes following the discovery of the AVM in 1988. Defendant alleges that Dr. Rao failed to provide sufficient evidence of the standard of care applying to either Dr. Brallier or Dr. Davis. We agree.

With regard to Dr. Brallier, plaintiff attempted to show that Dr. Brallier's failure to detect an AVM in the CAT scan violated the standard of care used in interpreting CAT scans in 1978. Dr. Rao testified to this standard of care in only one interchange:

"Q. Do you have an opinion based upon a reasonable degree of medical probability as to whether the standard of care was observed or violated by Children's Hospital on July 28th, 1978, in the reading of Anthony Stokes's CAT scan?

"A. I believe the standard of care was violated because the CAT scan was abnormal—to me."

Defendant contends that Dr. Rao failed to establish a standard of care because he never established an objective medical standard, but instead gave only his personal opinion.[2] As stated above, Dr. Rao answered "I believe ... the CAT scan was abnormal—to me."

Defendant also maintains that Dr. Rao failed to establish that, under the prevailing standard of care, most doctors would have detected the AVM. On cross-examination, Dr. Rao was asked:

"Q. And is it your testimony more than half of the competent radiologists who looked at that CAT scan in 1978 ...

would have interpreted that as showing an AVM?

"A. No. More than fifty percent doesn't mean a thing ... But also probably close to half would interpret it that this is not normal.

. . . . .

"Q. Meaning less than half?

"A. Well, it's not a question of half, or one. That's why I say, even that eighty percent might misinterpret it and twenty percent will interpret right."

As previously indicated, Dr. Rao's testimony was not sufficient to establish a standard of care for the interpretation of CAT scans applicable to radiologists in 1978. In establishing the standard of care, Dr. Rao was required to lay the foundation as to "the recognized medical standard." *Davis v. Virginian R. Co.*, 361 U.S. 354, 357–58, 80 S.Ct. 387, 389, 4 L.Ed.2d 366 (1959). Dr. Rao's personal interpretation of the CAT scan does not satisfy that burden. "In a case in which expert testimony is required, it is insufficient for the expert to state his opinion as to what he or she would have done under similar circumstances ... Rather, the jury must be informed of 'recognized standards requiring the proper ... procedures under the circumstances." *Levy v. Schnabel Found. Co.*, 584 A.2d 1251, 1255 (D.C.App.1991) (citation omitted). *See also Bell v. Jones*, 523 A.2d 982 (D.C.App.1986); *Meek v. Shepard*, 484 A.2d 579 (D.C.App.1984). In contrast, defendant's expert witness, Dr. Alfred Leussenhop, a neurosurgeon, explained at trial that there was no standard of care for interpreting CAT scans because the CAT scan in 1978 was still a relatively recent technique. Because Dr. Rao failed to introduce countervailing evidence of an objective standard upheld by a majority of radiologists, we conclude that there was insufficient evi-

---

2. Defendant also contends that Dr. Rao was not qualified to testify to the standard of care applying to Dr. Brallier because Dr. Rao was a neurologist, not a radiologist.

This fact does not, however, bar Dr. Rao's testimony regarding interpretation of CAT scans. "[A] physician need not be a specialist in the field of which he speaks in order to testify, and specialization goes to the weight rather than

to the admissibility, in order to give an opinion on whether the defendant complied with the applicable standard of care ..." *Snead v. United States*, 595 F.Supp. 658, 663 (D.D.C.1984) (citing *Baerman v. Reisinger*, 363 F.2d 309 (D.C.Cir. 1966)). But first of all, plaintiff's witness must establish the existence of the applicable standard of care. This Dr. Rao did not do.

dence for a jury to reasonably find that Dr. Brallier breached a standard of care.

With respect to Dr. Davis, plaintiff also attempted to demonstrate that Dr. Davis departed from the standard of care applied to neurological evaluations in 1978. Dr. Rao testified that the standard required a repeat CAT scan upon detecting the bruit and also required an arteriogram[3] if the orbital bruit persisted.[4] The arteriogram, Dr. Rao concluded, would have revealed the AVM and allowed for earlier treatment.

While Dr. Rao was not making this statement as a personal opinion, but as an objective standard of care required of neurologists in 1978, we still find that plaintiff failed to provide sufficient evidence of the applicable standard of care. In sharp contrast, defendant provided several expert witnesses who testified that Dr. Davis' actions complied with the prevailing standard of care of that time.[5] This was the overwhelming weight of the testimony. We find that no reasonable jury could have assigned greater weight to Dr. Rao's testimony than to that of defendant's experts.

### 2. Causation

■ Even if we assume that a jury might find that there was a breach of the applicable standard of care, which assumption we do not need to make, plaintiff has failed to provide sufficient evidence to establish that there was factual causation between said breach and the alleged injury. Specifically, even had Dr. Davis performed a repeat CAT scan and arteriogram and detected the AVM in 1978, there is no evidence for a jury to find that, as a result of such detection, plaintiff would have received any different treatment or that plaintiff suffered any injuries as a result of not having earlier treatment.

Dr. Rao also presented testimony for plaintiff regarding the issue of causation. Had the AVM been detected in 1978, Dr. Rao stated, plaintiff would have had several different treatment options to obliterate the AVM. First, Dr. Rao testified that, because the AVM would have been smaller in 1978, surgical removal would have been possible at that time. Second, Dr. Rao suggested that, if surgery were not possible, plaintiff might also have been treated through embolization or proton beam radiation therapy.

None of these possibilities, however, were conclusively established as viable options. In fact, the evidence weighs heavily to the contrary. With regard to surgery, defendant presented a number of expert witnesses who testified that continued surveillance, rather than surgery, would have been the preferred method of treatment in 1978. Significantly, the only expert who was a neurosurgeon, Dr. Alfred Leusenhopp, admittedly an authority with long experience, stated that no neurosurgeon in 1978 would have performed surgery on a child who had experienced a seizure and then recovered. With regard to the other options, Dr. Rao himself admitted that he didn't know to what extent embolization was used in 1978 and that proton beam

---

**3.** An arteriogram is an invasive procedure in which a contrast material is introduced in the blood vessels through a catheter in the groin area in order to allow for an x-ray examination of the blood vessels.

**4.** When asked about the standard of care, Dr. Rao stated:

> The standard of care would require one to review the previous charts, if they were there, to find out if there was any cause ... and then, because of that orbital bruit, to repeat the CAT scan even though the previous CAT scan was "normal," ... reevaluate for orbital bruit and if the CAT scan is still not conclusive and orbital bruit persisted, [then do an] arteriogram.

**5.** Dr. Davis explained at trial that she had ruled out the possibility of an AVM because the CAT scan was inconclusive and because plaintiff seemed to have recovered from the seizure. She therefore decided that the bruit might be cardiologically related, and ordered a cardiological work-up. Since the EEG was normal, she found no need to order a second CAT scan.

Defendant presented the testimony of several expert witnesses to demonstrate that Dr. Davis had complied with the standard of care. Dr. Benjamin Carson and Dr. William Lightfoote, both neurologists, confirmed that the standard of care did not require a repeat CAT scan or arteriogram if the EEG were normal and patient remained stable. Dr. Carson explained that an arteriogram was not advisable because of the risks inherent in the procedure.

radiation therapy was offered in only one location in Boston at that time. It is therefore most doubtful that Mr. Stokes would even have had access to these alternative treatments.

Since plaintiff's testimony regarding treatment options in 1978 was highly speculative, we find that plaintiff failed to provide the degree of certainty required for establishing causation. "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Gordon v. Neviaser,* 478 A.2d 292, 296 n. 2 (D.C.App.1984) (citing W. Prosser, *Handbook of the Law of Torts,* § 41, at 241–242 (4th ed. 1971)). *See also Sponaugle v. Pre–Term, Inc.,* 411 A.2d 366, 367 (D.C.App.1980) ("While absolute certainty is not required, opinion evidence that is conjectural or speculative is not permitted.").

Moreover, plaintiff has failed to establish with any certainty that any injury resulted from the failure to diagnose the AVM in 1978. Even if plaintiff had treatment in 1978, he would still be at risk of continued seizures and would still be required to take anti-convulsant medicine. Although plaintiff's risk of bleeds might have been reduced through surgery, plaintiff experienced no bleeds between 1978 and 1990. Finally, because of improved technologies, plaintiff may well have been more fortunate in having the treatment he received in 1990. Had he undergone proton radiation beam therapy in 1978, plaintiff may have been at high risk of leukemia or other forms of blood cancers. Viewing all the evidence in the light most favorable to plaintiff, we conclude that no jury could find that the failure to discover the AVM in 1978 caused Mr. Stokes any quantifiable or definite injury. The evidence at trial strongly suggested that Mr. Stokes is presently in the same, if not better, position having had delayed treatment.

## CONCLUSION

Having found that plaintiff has failed to produce sufficient evidence to establish an objective standard of care for the interpretation of CAT scans by radiologists in 1978 or that a potential breach of a neurological standard of care caused any injury to Mr. Stokes, we conclude that no jury could reasonably find defendant negligent. Accordingly, we therefore grant defendant's motion for entry of judgment as a matter of law.