922 P.2d 409

**Michael and Emma KEYSER, husband and wife, individually and as parents and guardians of Matthew Keyser, a minor, Plaintiffs–Respondents,**

v.

**Eric T. GARNER, M.D., Defendant– Appellant.**

**No. 21454.**

Court of Appeals of Idaho.

July 17, 1996.

Rehearing Denied July 17, 1996.

Hall, Farley, Oberrecht & Blanton, Boise, for defendant–appellant. Raymond D. Powers, argued.

Comstock & Bush, and Byron V. Foster (argued), Boise, for plaintiffs–respondents.

LANSING, Judge.

This is a medical malpractice action in which the plaintiffs allege negligence in the post-surgical care of a young child. The appeal is taken from the district court's order granting the plaintiffs' motion for a new trial after the jury returned a verdict in favor of the defendant physician. For the reasons that follow, we vacate the order allowing a new trial and remand the matter to the district court.

## I.

## FACTS

Matthew Keyser was born with a congenital anomaly involving defects in the structure of the mouth and jaw. This condition, known as Pierre Robin syndrome, results in a cleft palate and a compromise of the individual's airway. Matthew also suffered from abnormalities of his heart and lungs. As an infant, Matthew underwent a number of surgeries to repair his heart and improve his breathing. One of those surgeries was a tracheostomy performed by Dr. Eric Garner, an ear, nose and throat specialist (ENT), practicing in Boise. A tracheostomy is a surgical procedure in which an opening is made in the trachea and a plastic tube is inserted to provide an artificial airway through which the patient can breathe.

By the time Matthew was 18 months old, his physical condition had stabilized such that

Dr. Garner and Matthew's parents, Emma and Michael Keyser, agreed that Matthew should undergo surgery to repair his cleft palate. Matthew was admitted to St. Luke's Regional Medical Center in Boise (the hospital), where Dr. Garner performed this surgery without incident. Once it was determined that Matthew was stable following surgery, Dr. Garner ordered that Matthew be transferred from the post-operative recovery room to a bed on the pediatric floor of the hospital. Dr. Garner's orders for Matthew's care included an order that nursing staff suction Matthew's tracheostomy tube every two hours and as needed. The purpose of such suctioning is to remove blood and other secretions that may accumulate in the tube and close the airway. Trial evidence indicated that a nurse and respiratory therapist attending Matthew during the night after the surgery did not follow Dr. Garner's order to suction the tube at least every two hours and as needed. As a result, secretions accumulated in the tracheostomy tube and occluded the airway. At approximately 5 o'clock the next morning, Matthew suffered a prolonged respiratory arrest which caused irreversible brain damage with spastic quadriplegia.

The Keysers sued the hospital and Dr. Garner for negligence. As to the hospital, the Keysers alleged that the hospital's staff had been negligent in the tracheostomy care and in responding to Matthew's respiratory arrest. The evening before trial, however, the Keysers settled with the hospital, and the trial proceeded against Dr. Garner as the sole defendant. The Keysers alleged that Dr. Garner had not complied with the local standard of medical care, which required that a patient in Matthew's circumstances either be placed in the pediatric intensive care unit (PICU) of the hospital, where he would have received twenty-four-hour post-operative monitoring by a nurse, or be attached to a pulse oximeter, a device that monitors a patient's oxygen saturation levels and emits a signal when the patient's breathing is interrupted. The primary issue at trial, therefore, was whether Dr. Garner's decision to place Matthew on the general pediatric floor without a pulse oximeter constituted a violation of the local standard of practice and was,

in addition to the negligent conduct of the hospital's nursing staff, a proximate cause of the child's respiratory arrest and resulting injuries. The jury returned a verdict finding that Dr. Garner was not negligent.

Following the jury's verdict, the Keysers moved for judgment notwithstanding the verdict pursuant to I.R.C.P. 50(b) or, in the alternative, for a new trial, pursuant to I.R.C.P. 59(a). The district court denied the motion for judgment notwithstanding the verdict, but granted the motion for a new trial on two grounds: (1) that the court had committed error by admitting the expert testimony of a defense witness, Dr. Harlan Muntz, without adequate foundation, requiring a new trial under I.R.C.P. 59(a)(7); and (2) that the clear weight of the evidence supported a finding that Dr. Garner had breached the local standard of care by failing to place Matthew in PICU or on a pulse oximeter, entitling the Keysers to a new trial pursuant to I.R.C.P. 59(a)(6).

Dr. Garner appeals, asserting that the trial court abused its discretion in granting a new trial. After thoroughly reviewing the record, we hold that the trial court erred in concluding that Dr. Muntz's testimony should have been excluded. With respect to the trial court's ruling that a new trial should be granted because the jury's verdict was against the clear weight of the evidence, we find no error, assuming that the court took Dr. Muntz's testimony into consideration when evaluating the weight of the evidence. However, because we cannot ascertain whether the district court's decision to grant a new trial based on the weight of the evidence was influenced by the court's erroneous determination that Dr. Muntz's testimony was inadmissible, we vacate the order granting a new trial and remand for reconsideration of the plaintiffs' motion for a new trial in light of this appellate decision.

## II.

## ANALYSIS

### A. Foundation for Testimony of Out-of-Area Medical Experts

The grounds for which a new trial may be granted are set forth in I.R.C.P. 59(a). Sub-

section (7) of that rule allows a new trial to correct an error of law occurring at the trial. The district court ordered a new trial pursuant to this subsection based upon the court's conclusion that testimony of a defense expert was admitted in error. The district court concluded that an adequate foundation had not been laid to establish the qualifications of an out-of-state physician to testify to the standard of care in Boise.

Requirements for expert testimony on the standard of care in medical malpractice cases are established by I.C. §§ 6–1012 and 6–1013. Section 6–1012 specifies that, in order to prevail in a malpractice action, the plaintiff must show that the defendant health care provider "negligently failed to meet the applicable standard of health care practice of the community in which such care allegedly was or should have been provided...." The statute further states that "such individual providers of health care shall be judged in such cases in comparison with similarly trained and qualified providers of the same class in the same community, taking into account his or her training, experience, and fields of medical specialization, if any." [1]

Section 6–1013 states that the applicable standard of practice and the defendant health care provider's failure to meet that standard must be established by the testimony of at least one expert witness and that such expert witness must possess "professional knowledge and expertise coupled with actual knowledge of the applicable said community standard...." The statute further provides that, "this section shall not be construed to prohibit or otherwise preclude a competent expert witness who resides elsewhere from adequately familiarizing himself with the standards and practices of (a particular) such area and thereafter giving opinion testimony in such a trial." [2] Under these statutory standards, if the expert is not from the community where the alleged malpractice occurred, in order to present opinion testimony the expert must first demonstrate an adequate familiarity with local standards of

---

1. Idaho Code § 6–1012 states:

   In any case, claim or action for damages due to injury to or death of any person, brought against any physician and surgeon or other provider of health care, including, without limitation, any dentist, physicians' assistant, nurse practitioner, registered nurse, licensed practical nurse, nurse anesthetist, medical technologist, physical therapist, hospital or nursing home, or any person vicariously liable for the negligence of them or any of them, on account of the provision of or failure to provide health care or on account of any matter incidental or related thereto, such claimant or plaintiff must, as an essential part of his or her case in chief, affirmatively prove by direct expert testimony and by a preponderance of all the competent evidence, that such defendant then and there negligently failed to meet the applicable standard of health care practice of the community in which such care allegedly was or should have been provided, as such standard existed at the time and place of the alleged negligence of such physician and surgeon, hospital or other such health care provider and as such standard then and there existed with respect to the class of health care provider that such defendant then and there belonged to and in which capacity he, she or it was functioning. Such individual providers of health care shall be judged in such cases in comparison with similarly trained and qualified providers of the same class in the same community, taking into account his or her training, experience, and

   fields of medical specialization, if any. If there be no other like provider in the community and the standard of practice is therefore indeterminable, evidence of such standard in similar Idaho communities at said time may be considered. As used in this act, the term "community" refers to that geographical area ordinarily served by the licensed general hospital at or nearest to which such care was or allegedly should have been provided.

2. Idaho Code § 6–1013 states:

   The applicable standard of practice and such a defendant's failure to meet said standard must be established in such cases by such a plaintiff by testimony of one (1) or more knowledgeable, competent expert witnesses, and such expert testimony may only be admitted in evidence if the foundation therefor is first laid, establishing (a) that such an opinion is actually held by the expert witness, (b) that the said opinion can be testified to with reasonable medical certainty and (c) that such expert witness possesses professional knowledge and expertise coupled with actual knowledge of the applicable said community standard to which his or her expert opinion testimony is addressed; provided, this section shall not be construed to prohibit or otherwise preclude a competent expert witness who resides elsewhere from adequately familiarizing himself with the standards and practices of (a particular) such area and thereafter giving opinion testimony in such a trial.

care.[3] *Watts v. Lynn,* 125 Idaho 341, 345, 870 P.2d 1300, 1304 (1994); *Strode v. Lenzi,* 116 Idaho 214, 775 P.2d 106 (1989); *Frank v. East Shoshone Hospital,* 114 Idaho 480, 757 P.2d 1199 (1988); *Kunz v. Miciak,* 118 Idaho 130, 131, 795 P.2d 24, 25 (Ct.App.1990). The focus in the present case is upon the method by which an out-of-town expert in a medical malpractice case may gain "actual knowledge" of the local standard of care as required by I.C. § 6–1013.

At trial, one of Dr. Garner's standard of care experts was Dr. Harlan Muntz, who was a board-certified pediatric ENT practicing at Children's Hospital in St. Louis, Missouri, and also a faculty member of Washington University Medical School. Dr. Muntz worked in the cleft palate and craniofacial institute at Children's Hospital. Dr. Muntz testified that he was the chairman of the hospital's tracheostomy and airway communication team, which reviewed the care of all of the hospital's child patients with tracheostomies. Dr. Muntz stated that, in order to familiarize himself with the Boise standard of practice for the post-operative management of pediatric tracheostomy patients undergoing cleft palate surgery, he had spoken with a board-certified ENT practicing in Boise, reviewed Matthew's medical records and reviewed depositions, taken in this case, of other physicians who have practiced in Boise. In his conversation with the local ENT, Dr. Muntz obtained information about the hospital, the anesthesia service that is available to surgeons who admit patients to the hospital for surgery, the facilities and monitoring available at the hospital's PICU, the type of nursing and respiratory therapy services available on the general pediatric floor, the overall quality and interaction between ear, nose and throat surgeons in Boise, and the way other Boise surgeons had managed cases similar to Matthew's case prior to August 1991. Based upon this information, Dr. Muntz opined that the local standard of care

at the time of the alleged negligence did not require that Matthew be placed in the PICU or be monitored by a pulse oximeter.

Although Dr. Muntz was permitted to testify at trial, in response to the Keysers' motion for a new trial the district court concluded that the testimony should have been excluded because an inadequate foundation had been laid for Dr. Muntz's testimony regarding the standard of care in Boise. The district court explained its decision as follows:

> In my view, it is essential to bear in mind that in all of these early cases,[4] the expert from afar had a personal opinion that there did exist a national standard of care on point, and that the expert from afar knew what the national standard of care was; in all of these cases, the expert was of the opinion that the applicable local standard of care ought to be the same as the national standard of care applicable to the board specialty under examination. Any local inquiry by the out-of-state expert, then, was not to determine what the standard of care in the community was, but rather was only to determine whether there were any local deviations from an existing national standard which would bear on the subject.

> . . . .

> Within this context, then, the testimony of Dr. Muntz was seriously flawed. He never testified to the existence of a national standard of care applicable to board certified [ENT's] when performing cleft palate repairs upon infants with tracheostomies, nor did he testify that he held a personal opinion on what the appropriate national standard of care was or ought to be. . . . In substance, his testimony was only that he had made inquiry of others as to what the standard of care was, and that

---

3. We note that both Section 6–1012 and Section 6–1013 refer to standards that must be met by a plaintiff in order to prove a claim for damages against a health care provider. We agree with the district court, however, that the same standards govern the admissibility of evidence offered by a defendant, and Dr. Garner does not argue to the contrary.

4. The district court was referring to *Strode v. Lenzi,* 116 Idaho 214, 775 P.2d 106 (1989); *Buck v. St. Clair,* 108 Idaho 743, 702 P.2d 781 (1985), and *LePelley v. Grefenson,* 101 Idaho 422, 614 P.2d 962 (1980).

based upon what others had told him, he was of the opinion that Dr. Garner had satisfied the local standard. In effect, this meant that the entire basis for this witness's opinion on the standard of care was based upon hearsay, rather than only the component of local deviations from a national standard. I think this is insufficient to constitute the necessary foundation for the opinions rendered under Idaho Code § 6–1013 and the cases cited above.[5]

■ Thus, the district court concluded that a conversation with a local physician will suffice to familiarize an out-of-town expert with the local standard of care in cases where the expert testifies that there is a national standard of care and that there are no local deviations from the national standard. The court held that the foundational requirements outlined in I.C. § 6–1013(c) are more stringent, however, in cases like the present action, where there is no testimony as to the existence of a national standard of care. In the latter circumstance, the district court concluded, "a great deal more is required for the adequate preparation than merely reading the medical chart and talking with one specialist in the field."

As the district court aptly stated, the question of how to qualify an out-of-area physician to render an opinion in a medical malpractice case "has plagued the bench and trial bar since the enactment of Idaho's statutory structure . . . requiring proof [of] actual knowledge of the local standard of care." This issue of how to meet the foundational standards for out-of-area experts has been addressed a number of times by the Idaho Supreme Court since the enactment of I.C. § 6–1013. The first such decision is *Buck v. St. Clair*, 108 Idaho 743, 702 P.2d 781 (1985). In that case, the trial court had concluded

that the plaintiff's out-of-state expert lacked actual knowledge of the Boise standard of care because he had not practiced in Boise, had not admitted patients to Boise hospitals, had not evaluated any area medical facilities, and was not familiar with any local medical literature. The trial court therefore granted a directed verdict for the defendant. The Supreme Court reversed. The Court stated that an out-of-town physician must make an inquiry to ensure that there are no local deviations from the national standard. In the *Buck* case, the plaintiff's expert testified that he obtained familiarity with the local standard through his specialty training and through questioning of a Caldwell physician who informed the expert that the local standard was equivalent to the national standard. The Idaho Supreme Court found this inquiry sufficient to qualify the witness to testify.[6]

The next pertinent decision is *Frank v. East Shoshone Hospital*, 114 Idaho 480, 757 P.2d 1199 (1988). In that case, summary judgment had been granted to the defendant because the deposition testimony of the plaintiff's expert did not establish that the witness was familiar with the standard of care in Idaho. In his deposition, the witness said he had not discussed the standard of care with any doctors practicing in the local area. The Supreme Court affirmed the summary judgment. Significantly for the issue here presented, the majority opinion states:

> Our decision today does not cast an onerous burden on plaintiffs in medical malpractice actions. It is not an overly burdensome requirement to have an expert become familiar with the standard of care in the community where alleged malpractice is committed. In *Buck v. St. Clair*, the expert became familiar with the local

---

5. The district court also observed that Dr. Muntz did not perform cleft palate repair surgery and had never performed this operation on a pediatric patient with a tracheostomy. As Dr. Garner points out, however, Dr. Muntz's lack of experience in performing cleft palate surgery did not disqualify him as an expert, for the surgical procedure itself was not criticized in this case. In the aspect of care that underlay the Keysers' claim, the post-surgical care of children with tracheostomies, Dr. Muntz had extensive experience.

6. The majority opinion in *Buck* also expressed the view that for board-certified specialists, the local standard of care is equivalent to the national standard and that a board-certified specialist can testify regarding this standard of care against another board-specialist practicing in the same specialty area. A few years later, however, in *Grimes v. Green*, 113 Idaho 519, 746 P.2d 978 (1987), the Supreme Court majority disavowed, as dicta, this language in *Buck* indicating that a national standard of care exists for all board-certified specialists.

standard of care by simply questioning a local doctor.

*Id.* at 482, 757 P.2d at 1201 (citation omitted). In a concurring opinion, Justice Huntley similarly observed that: "[I]t does not take a Herculean effort for an expert to become familiar with the local standard of care. It can be done on the telephone." *Id.* at 484, 757 P.2d at 1203.

The sufficiency of the foundation for an out-of-town physician's testimony was again at issue in *Kozlowski v. Rush*, 121 Idaho 825, 828 P.2d 854 (1992). The Supreme Court held the foundation adequate where the witness had read the depositions of the defendant physician and several nurses, had spoken to a physician practicing in the local community and had read the deposition of another local physician, Dr. Rufi. In his deposition, Dr. Rufi had testified that the local standard for board-certified obstetricians did not differ from the national standard. The Supreme Court held that, by virtue of reading this portion of Dr. Rufi's deposition, the plaintiff's expert witness had adequately familiarized himself with the local standard of care.

In *Watts v. Lynn*, 125 Idaho 341, 870 P.2d 1300 (1994), the affidavit of the plaintiff's expert, a board-certified endodontist from San Francisco, stated that he had familiarized himself with standards applicable in Wallace, Idaho, by discussing the subject with Dr. Branz, a dentist practicing there, who confirmed that the standards of care for dentistry and endodontics in Wallace were the same as the national standards in the same areas of practice. This affidavit was found sufficient to withstand the defendant's summary judgment motion even though the defendant had obtained an affidavit from Dr. Branz stating Dr. Branz's opinion that the defendant dentist had complied with the community standards in caring for the plaintiff. The Supreme Court found that the affidavit of the plaintiff's expert complied with the requirements of I.C. § 6–1013 because it indicated that the expert had familiarized himself with the community standard and provided a factual background to support his familiarization. *Id.* at 346, 870 P.2d at 1305.

Most recently, in another decision reversing a summary judgment, *Dunlap v. Garner*, 127 Idaho 599, 903 P.2d 1296 (1995), the Supreme Court held that the affidavit of a physician from Renton, Washington, presented admissible testimony regarding the standard of care in Burley, Idaho. The affidavit stated that the affiant had consulted by telephone with two physicians in Burley with respect to standards of practice for the delivery of obstetrical services by family practitioners in Burley. The affidavit related in some detail what the expert was told by the two Burley physicians. The affidavit presented the conclusion that the standard of care for family practitioners delivering obstetrical care in Burley was no different from that in other parts of Idaho and the northwestern United States, including the affiant's own state, Washington. The Supreme Court held that the statements in this affidavit, taken as true, were sufficient to qualify the witness to express an expert opinion relative to the standard of care in Burley.

The foregoing cases all indicate the foundational prerequisite of familiarity with the community standard of care is satisfied by an out-of-area physician's testimony that he or she has conversed about those standards with a qualified physician practicing in the community and has thereby become knowledgeable about the local standards.

In all of the reported Idaho appellate decisions holding the foundational standards to be satisfied, the outside expert testified that there existed a national or regional standard of care with which the expert was already familiar and that the applicable community standard did not deviate from that national or regional standard. Therefore, we agree with the district court that no prior authority is directly on point regarding the foundational requirements of I.C. § 6–1013 when there exists no national or regional standard against which to compare the local standard of care. However, unlike the district court, we do not infer from the statute or case law any suggestion that the foundational prerequisites for expert testimony are more stringent in such cases. In *Buck v. St. Clair*, the Idaho Supreme Court did state in dicta that, "the foundation required to show an expert

witness had actual knowledge of the local standard of care for non-certified specialists may be more rigorous" than for those who are board certified. *Buck,* 108 Idaho at 747, 702 P.2d at 785. However, because both Dr. Muntz and Dr. Garner are board-certified ENT's, this statement is not applicable here.[7] We find nothing in *Buck* or in any of the subsequent decisions which suggests that the requirements of I.C. § 6–1013 would be more stringent when there is no national standard of care.

We conclude, therefore, that even where no national standard applies, an out-of-area physician may satisfy the foundational criteria of I.C. § 6–1013 by obtaining information about the local standard of practice through consultations with one or more qualified local physicians. Accordingly, we hold that the district court erred in granting the Keysers' motion for a new trial on the ground that Dr. Muntz's testimony had been improperly admitted at the original trial.

## B. New Trial Based Upon Weight of the Evidence, I.R.C.P. 59(a)(6)

■ We must next consider the district court's alternative ground for ordering a new trial based upon I.R.C.P. 59(a)(6). That subsection authorizes a new trial due to "insufficiency of the evidence to justify the verdict." This provision permits the trial court to weigh all the evidence and make its own determination of the credibility of the witnesses, and to grant a new trial if the court concludes that the verdict is not in accord with the clear weight of the evidence. *Robertson v. Richards,* 115 Idaho 628, 631, 769 P.2d 505, 508 (1989); *Quick v. Crane,* 111 Idaho 759, 766, 727 P.2d 1187, 1194 (1986); *Litchfield v. Nelson,* 122 Idaho 416, 422, 835 P.2d 651, 657 (Ct.App.1992).

■ We apply a deferential standard in reviewing a district court's order for a new trial under I.R.C.P. 59(a)(6). Because the trial court is in a better position to assess the demeanor, credibility, and testimony of the witnesses and the persuasiveness of all the

evidence, we will uphold a trial court's grant or denial of a motion for a new trial "unless the court has *manifestly* abused the wide discretion vested in it." *Quick v. Crane,* 111 Idaho at 770, 727 P.2d at 1198. The test for evaluating whether a trial court has abused its discretion is set out in *Sun Valley Shopping Center v. Idaho Power,* 119 Idaho 87, 803 P.2d 993 (1991). We determine (1) whether the court correctly perceived the issue as one of discretion; (2) whether the court acted within the boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the court reached its decision by an exercise of reason. *Id.* at 94, 803 P.2d at 1000. Thus, we are constrained to focus on the process by which the trial court reached its decision and must refrain from engaging in result-oriented appellate review of the trial court's discretionary decision. *Quick,* 111 Idaho at 772, 727 P.2d at 1200.

Accordingly, we review the trial court's decision to grant the Keysers' motion for a new trial, applying the three-part test enunciated in *Sun Valley Shopping Center.* It is not disputed that the trial court correctly understood the issue to require an exercise of discretion. We proceed therefore, to examine whether the trial court acted in compliance with the applicable legal standards.

■ A two-pronged analysis has been established which the trial court must follow in ruling on a motion for a new trial. The first prong directs the trial judge to consider whether the verdict was against the weight of the evidence and whether the ends of justice would be served by vacating the verdict. *Burggraf v. Chaffin,* 121 Idaho 171, 174, 823 P.2d 775, 778 (1991); *Robertson,* 115 Idaho at 631–32, 769 P.2d at 508–09; *Blaine v. Byers,* 91 Idaho 665, 671, 429 P.2d 397, 403 (1967). The second prong requires the trial court to consider whether a different result would follow in a retrial. *Burggraf,* 121 Idaho at 174, 823 P.2d at 778; *Blaine,* 91 Idaho at 671, 429 P.2d at 403. Although the mere

---

7. Moreover, the continuing vitality of this statement in *Buck* is called into question by the Supreme Court's subsequent disclaimer of other statements in *Buck* indicating that the local stan-

dard of care for board-certified specialists is equivalent to the national standard. *See* note 6, *supra.*

fact that the evidence is in conflict is not enough to set aside a jury verdict, when a motion for a new trial is made on the ground that the verdict is against the weight of the evidence, the judge is free to weigh the conflicting evidence for himself. *Robertson*, 115 Idaho at 630–632, 769 P.2d at 507–09. The trial court is not merely authorized to engage in this weighing process, it is obligated to do so. *Sanchez v. Galey*, 112 Idaho 609, 614, 733 P.2d 1234, 1239 (1986). A verdict may be set aside even though there is substantial evidence to support it, and in weighing a motion for a new trial, the trial court is not required to view the evidence in a light most favorable to the verdict winner. *Jones v. Panhandle Dist. Inc.*, 117 Idaho 750, 754, 792 P.2d 315, 319 (1990); *Quick*, 111 Idaho at 767, 727 P.2d at 1195. "If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial." *Id.*, at 768, 727 P.2d at 1196, *quoting* Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, 11 FEDERAL PRACTICE AND PROCEDURE § 2806, at 49 (1973 & Supp.1985).

■ In the case before us the trial court specifically followed the analytical structure set forth in *Blaine* and later described in *Robertson* and *Burggraf.* The court first acknowledged that it was required to make an independent evaluation of the evidence and that it was exercising its power to grant a new trial based upon that reevaluation. The court then concluded that the jury had made a mistake. The court stated, "[I] am satisfied that the same evidence measured properly by a different jury would and should lead to a different result." Hence, the district court correctly identified and applied the standards governing its decision whether to grant a new trial.

■ We turn then to Dr. Garner's argument that the trial court did not reach its decision by the exercise of reason. Dr. Garner asserts that the record does not support the reasoning expressed by the district court in finding the verdict to be faulty. Specifically, Dr. Garner avers that the trial court abused its discretion in vacating the jury verdict because the trial court acknowledged that the hospital was negligent and that, had nursing and respiratory therapy staff followed Garner's orders, Matthew's respiratory arrest would never have occurred.

Resolution of this issue requires an elaboration of the trial evidence. The Keysers' experts testified that Dr. Garner breached the local standard of care by failing to anticipate and take precautions against the risk of post-operative airway management problems. Appropriate precautions, they said, should have included placing Matthew in the PICU or monitoring his blood oxygen level with a pulse oximeter. The need for careful and regular suctioning of the tracheostomy tube, they said, dictates that a pediatric patient who has had surgery at a site above the tracheostomy be given closer observation than is normally provided on a general pediatric ward. The PICU is designed to provide more one-on-one nursing care, and patients placed in the PICU are routinely attached to all available monitoring units, including pulse oximeters. As an alternative to placement in PICU, these experts opined that Matthew properly could have been placed on the general pediatric floor if Dr. Garner had ordered use of a pulse oximeter, which would sound an alarm if Matthew's respiration was interrupted. The expert witnesses for the Keysers were also of the view that Dr. Garner was negligent in failing to adequately stress to hospital staff the importance of the suctioning order by emphasizing it on his written order, discussing it with the nurses, or checking to ensure that the order was being followed as written.

These conclusions were contested by defense experts who were of the opinion that the applicable standard of care did not require placement of the patient on the PICU or monitoring by pulse oximetry. Defense experts testified that these measures were not necessary because the patient was medically stable prior to transfer to the pediatric floor and for the twelve hours following surgery. They also opined that Dr. Garner's orders to suction every two hours and as needed were adequate, and had they been followed, Matthew would not have suffered respiratory arrest. Defense experts were

also of the opinion that, even if the patient had been monitored by a pulse oximeter, the device would have only emitted a signal after Matthew had stopped breathing. Therefore, use of an early warning device would not have prevented the arrest or shortened the response time, since the arrest was witnessed by a nurse and a respiratory therapist. The nurse and therapist who were responsible for Matthew's care from 11 p.m. until the time of the arrest were inexperienced in providing tracheostomy care. According to physicians and nurses who testified as experts for the defense, it was the negligence of the hospital's staff prior to and in response to the arrest that caused Matthew to suffer a prolonged arrest, not the failure of Dr. Garner to take additional precautionary measures.

While acknowledging the points made by defense experts, the trial court determined that much of the defense testimony about the inefficacy of pulse oximetry to prevent Matthew's injury was premised upon the assumption that the respiratory arrest was witnessed. In evaluating this testimony, the court noted that there was also evidence, based upon the extent of Matthew's brain damage, that the arrest lasted at least three to four minutes and probably longer. In light of this evidence, the trial court questioned the credibility of the nurse and therapist who said they were present when Matthew stopped breathing and that responsive action was taken quickly to restore his airway. The district court therefore discounted the expert opinions that warning from a pulse oximeter would not have prevented or shortened the period of oxygen deprivation, because these opinions were predicated on the claims of the nurse and therapist that they witnessed the arrest. The court found most persuasive expert testimony that Dr. Garner's failure to anticipate and plan for non-surgical complications resulted from his relative inexperience and that a prudent surgeon would have foreseen and planned for post-operative complications, including the risk of patient care by inexperienced hospital staff. The court concluded that, had Matthew been admitted to PICU or had the use of a pulse oximeter been ordered to monitor changes in Matthew's oxygen levels, nurses would have been immediately alerted to the arrest and would have provided responsive care with less delay.

In reviewing the trial court's decision, we observe that there was substantial, essentially uncontroverted evidence that hospital staff members were negligent and that, had they followed Dr. Garner's orders, Matthew likely would not have been injured. This evidence supports the jury's verdict. Nonetheless, there is also support for the trial court's view that the evidence favored a finding that Dr. Garner also was negligent and that his negligence contributed to Matthew's injury. In acting upon a new trial motion, the trial court may set aside a verdict based upon its independent evaluation of the evidence even though the verdict is supported by substantial evidence. On appeal, we review the evidence but are not in a position to reweigh it as the trial court does. *Burggraf v. Chaffin*, 121 Idaho at 173, 823 P.2d at 777; *Quick*, 111 Idaho at 768, 727 P.2d at 1196; *Litchfield*, 122 Idaho at 422, 835 P.2d at 657.

In reaching its decision, the district court recognized its discretionary authority, followed the legal standards governing disposition of motions for new trials and reached its decision based upon an exercise of reason. Therefore, we do not perceive an abuse of discretion in the order granting a new trial under I.R.C.P. 59(a)(6).

We conclude, however, that it is not appropriate to affirm that order outright because it is unclear whether, in assessing the weight of the evidence of negligence, the trial court considered the testimony of Dr. Muntz or disregarded that testimony due to the court's incorrect conclusion that it was inadmissible. From the record before us we cannot determine whether, in ruling upon the motion for a new trial under I.R.C.P. 59(a)(6), the court would have exercised its discretion in the same manner if it had considered Dr. Muntz's testimony to be admissible. Therefore, we vacate the order granting a new trial and remand this matter so that the district court may again consider the Rule 59(a)(6) motion in light of our determination that a sufficient foundation was established for Dr. Muntz's opinion testimony.

## III.

### CONCLUSION

We hold that the district court erred in ruling that, where no national standard of care exists, discussions with a knowledgeable local physician to ascertain the community standard of care will not be sufficient to qualify an out-of-town physician as an expert witness under I.C. § 6–1013. The grant of a new trial pursuant to I.R.C.P. 59(a)(7) therefore is reversed. With respect to the district court's decision to grant a new trial on the alternative ground, under I.R.C.P. 59(a)(6), that the jury verdict was against the weight of the evidence, we do not find an abuse of discretion, but we vacate the order to permit the district court to reconsider the motion for a new trial in light of this Court's determination that Dr. Muntz's testimony was properly admitted. Costs on appeal are awarded to respondents.

WALTERS, C.J., and SWANSTROM, J. Pro Tem., concur.